No. 25-2510

IN THE
UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

| | | |
|---|---|---|
| STANLEY LIGAS, ISAIAH FAIR, JAMIE MCELROY, JENNIFER WILSON, DAVID CICARELLI, and BURTON A. BROWN | ) ) ) ) | Appeal from the United States District Court for the Northern District of Illinois |
| | ) | |
| Plaintiffs-Appellees, | ) | |
| | ) | |
| v. | ) | |
| | ) | No. 1:05-cv-04331 |
| DULCE QUINTERO, in her official capacity as Secretary of the Illinois Department of Human Services, and ELIZABETH M. WHITEHORN, in her official capacity as Director of the Illinois Department of Healthcare and Family Services, | ) ) ) ) ) ) ) | |
| | ) | The Honorable |
| | ) | SHARON JOHNSON COLEMAN, |
| Defendants-Appellants. | ) | Judge Presiding. |

**BRIEF AND SHORT APPENDIX OF DEFENDANTS-APPELLANTS**

**KWAME RAOUL**
Attorney General
State of Illinois

**JANE ELINOR NOTZ**
Solicitor General

**JONATHON M. STUDER**
Assistant Attorney General
115 South LaSalle Street
Chicago, Illinois 60603
(312) 814-0937 (office)
(312) 415-8065 (cell)
Jonathon.Studer@ilag.gov

115 South LaSalle Street
Chicago, Illinois 60603
(312) 814-3000

Attorneys for Defendants-Appellants

**ORAL ARGUMENT REQUESTED**

**TABLE OF CONENTS**

**Page(s)**

TABLE OF AUTHORITIES ................................................................................. iii

INTRODUCTION ............................................................................................... 1

JURISDICTIONAL STATEMENT ..................................................................... 5

ISSUE PRESENTED FOR REVIEW ................................................................. 7

STATEMENT OF THE CASE ............................................................................ 8

    Operative Complaint ................................................................................. 9

    Settlement, Joint Motion for Class Certification, and Entry of Decree ............ 11

    2011 Consent Decree ............................................................................... 12

    Measures Taken by the State Since the Decree's Approval ............................. 15

    As the District Court Sought an "Exit Plan," the Monitor Identified
    Only Three Remaining Issues .................................................................. 22

    Motion to Vacate ..................................................................................... 26

    Motion for Reconsideration ...................................................................... 30

    The State Has Continued to Improve Its System ........................................ 31

SUMMARY OF ARGUMENT ........................................................................... 32

ARGUMENT ..................................................................................................... 33

I.    The court reviews the denial of a Rule 60(b)(5) motion for abuse of
    discretion but reviews legal questions *de novo* ......................................... 33

II.   The district court should have vacated the decree because the decree
    has been satisfied .................................................................................... 33

    A.    The State satisfied the decree. ........................................................ 34

i

        1.      The State achieved the decree's objectives and implemented a durable remedy.........................................34

        2.      The State substantially complied with the terms of the decree. ........................................................................37

   B.      The issues the monitor and plaintiffs identified do not support the district court's decision denying the State's motion to vacate...............43

III.    Alternatively, the district court should have vacated the decree because applying it prospectively is no longer equitable. ..................................48

CONCLUSION .................................................................................56

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF RULE 30 COMPLIANCE

SHORT APPENDIX

CERTIFICATE OF FILING AND SERVICE

# TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*Denius v. Dunlap,*
    330 F.3d 919 (7th Cir. 2003) ............................................................. 13

*Glob. Relief Found. Inc. v. O'Neill,*
    315 F.3d 748 (7th Cir. 2002) ............................................................. 54

*Holmes v. Godinez,*
    991 F.3d 775 (7th Cir. 2021) ............................................................. 33

*Horne v. Flores,*
    557 U.S. 433 (2009) ....................................... 26, 33, 48-49, 51, 53-54

*Jackson v. Los Lunas Community Program,*
    880 F.3d 1176 (10th Cir. 2018) ......................................................... 37

*Lewis v. Casey,*
    518 U.S. 343 (1996) ......................................................................... 38

*Ligas ex rel. Foster v. Maram,*
    478 F.3d 771 (7th Cir. 2007) ............................................................... 8

*Milliken v. Bradley,*
    433 U.S. 267 (1977) ......................................................................... 48

*Missouri v. Jenkins,*
    515 U.S. 70 (1995) ........................................................................... 48

*Olmstead v. L.C.,*
    527 U.S. 581 (1999) ...............................................................*passim*

*Paradigm Care & Enrichment Ctr., LLC v. West Bend Mut. Ins. Co.,*
    33 F.4th 417 (7th Cir. 2022)............................................................. 38

*Peery v. City of Miami,*
    977 F.3d 1061 (11th Cir. 2020) ..................................... 26, 33-34, 37-38

*Philos Techs., Inc. v. Philos & D, Inc.,*
    802 F.3d 905 (7th Cir. 2015) ............................................................. 33

*Salazar by Salazar v. D.C.*,
    896 F.3d 489 (D.C. Cir. 2018) .................................................... 38

*Shakman v. Clerk of Cook Cnty.*,
    994 F.3d 832 (7th Cir. 2021) ...................................................... 5

*Shakman v. Pritzker*,
    43 F.4th 723 (7th Cir. 2022).............................................*passim*

*Steimel v. Wernert*,
    823 F.3d 902 (7th Cir. 2016) ...................................................... 9

**Statues and Regulations**

21 U.S.C. § 2107(a) ...................................................................... 6

28 U.S.C. § 1292(a)(1) .................................................................. 5

28 U.S.C. § 1331 ......................................................................... 5

28 U.S.C. § 1343 ......................................................................... 5

29 U.S.C. § 794(a) .................................................................... 5, 8

42 U.S.C. § 1983 ...................................................................... 5, 8

42 U.S.C. § 12132 .................................................................... 5, 8

42 U.S.C. §§ 1396-1396v ............................................................ 5, 8

210 ILCS 47/3-202 ...................................................................... 53

**Rules**

Fed. R. App. P. 4(a)(4)(A)(iv) ....................................................... 6

Fed. R. Civ. P. 54(a) .................................................................... 6

Fed. R. Civ. P. 59(e).................................................................. 5-6

Fed. R. Civ. P. 60(b)(5)................................................. 3, 5, 33, 48, 53

**Other Authorities**

Ill. Dep't Healthcare and Fam. Serv., Adults with Developmental Disabilities
https://hfs.illinois.gov/medicalclients/hcbs/dd.html ........................................................ 13

Ill. Dep't of Hum. Serv., DDD Current Rate Table – Last Modified August 1, 2017,
https://www.dhs.state.il.us/page.aspx?item=38992 ...................................................... 17

Ill. Dep't of Hum. Serv., DDD Rate Table – Effective January 1, 2026,
https://www.dhs.state.il.us/page.aspx?item=176268 .................................................... 17

Ill. Dep't of Hum. Serv., DDD Pre-Admission Screening Manual ("DDD Manual"),
Chapter 200, https://www.dhs.state.il.us/page.aspx?item=53021 ............................... 15

Ill. Dep't of Hum. Serv., DDD Pre-Admission Screening Manual ("DDD Manual"),
Chapter 1000, https://www.dhs.state.il.us/page.aspx?item=53029 .................. 12, 15-16

Ill. Dep't of Hum. Serv., Persons Served – End of Fiscal Year (FY13 to FY25),
https://www.dhs.state.il.us/page.aspx?item=166653 ..................................................... 17

Ill. Dep't of Hum. Serv., Independent Service ("ISC") Manual, Section 3
https://www.dhs.state.il.us/page.aspx?item=115416#a_toc7 ...................................... 16

Ill. Dep't of Hum. Serv., Ligas Data Report as of June 30, 2025
https://www.dhs.state.il.us/page.aspx?item=174856 ............................................... 17-18

**INTRODUCTION**

For the past 15 years, the State of Illinois has been supervised by a federal district court and a series of court-appointed monitors, who are overseeing the State's work to transition individuals with developmental disabilities from privately run institutional settings into the community. These proceedings began because the State lacked a system that allowed plaintiffs to receive services in a community setting. As reflected in the Supreme Court's 1999 decision in *Olmstead v. L.C.*, 527 U.S. 581, attitudes towards people with developmental disabilities and the legal doctrine regarding their rights were evolving in that era. But the State's system — in plaintiffs' words — remained "antiquated" and its efforts to respond "paltry." Doc. 1 at 1. Plaintiffs filed their class action complaint in 2005, principally seeking "redress for Defendants' practice of requiring them to reside in large, privately-run congregate care institutions'" — called "intermediate facilities" in this brief — "as a condition of receiving the long-term care services" they need and for which they qualify. *Id.*

To meet its *Olmstead* responsibilities, the State entered into a consent decree with plaintiffs in 2011, which placed six primary obligations on the State: (1) to maintain a database of class members, and place class members who were residing in a family home and "at risk" of institutionalization on a waiting list for community services; (2) to prepare a transition plan for each class member; (3) to transition class members residing in intermediate facilities to the community by June 2017; (4) to provide community services to at least 3,000 people from the waiting list by June

2017; (5) to move the remaining class members from the waiting list at a "reasonable pace"; and (6) to implement sufficient measures to ensure the availability of services, supports, and other resources of "sufficient quality, scope and variety to meet [its] obligations" to individuals with developmental disabilities.

Following the entry of the decree, the State began implementation to remove the specific barriers alleged by plaintiffs and allow them to receive services in the community at a reasonable pace in compliance with *Olmstead*. The State redesigned its policies and procedures, dramatically increased annual spending, broadened its services and supports, increased the number of individuals served through the State's Medicaid waiver program for providing services in the community, and, as a result, met the requirement of moving individuals from the waiting list to the community at a reasonable pace.

The State's diligent efforts for almost 15 years have eliminated the systemic barriers alleged in the complaint and fulfilled each of the six primary obligations outlined in the consent decree. In June 2023, the district court sought an exit plan for the decree and asked the parties to determine how to "resolve this matter such that the consent decree is no longer needed." Doc. 806. When asked by the court to identify the issues that justified the decree remaining open, the monitor identified only three discrete issues, and plaintiffs' arguments for keeping the decree in place largely echoed the monitor's. But, reflecting the work done over more than a decade to institute new systems, the issues raised by both plaintiffs and the monitor were narrow and individualized, either impacting less than 2% of the class or focusing on

alleged "best practices" not required by the Constitution, any statute, or the decree itself.  Plaintiffs and the monitor later argued that the State was not moving class members off the waiting list at a reasonable pace, but this change of position was contradicted by a joint status report agreeing that the State was exceeding its reasonable pace obligations, a prior report of the monitor, and the underlying data.

The State filed a motion to vacate the decree pursuant to Fed. R. Civ. P. 60(b), citing the durable remedy it had implemented and the drift away from federal law in the proceedings below.  The State highlighted the federalism concerns attendant to ongoing federal oversight of state agencies where the decree has been satisfied and the ongoing oversight lacks any tether to federal law.  But rather than terminate the decree, as is warranted by the State's demonstrated commitment to compliance with federal law and satisfaction of the decree, the district court denied the motion to vacate without analysis or discussion in a minute order.  The court declined to provide clarity about the basis for its denial when requested, and instead delegated the question of what constitutes "substantial compliance" with the consent decree to a another new monitor appointed after the State's motion was denied.

The decree should be terminated.  While individualized issues impacting very small numbers of class members always will be present in an area as complex as providing appropriate housing and services to people with developmental disabilities, those issues cannot justify the intrusion of a federal court superintending the details of state programs.  The class-wide proceedings below no longer possess the required connection to a systemic violation of federal law, and are incompatible with the

federalism concerns that should guide a court's determination of when a consent decree should be vacated.

**JURISDICTIONAL STATEMENT**

Plaintiffs, individuals with developmental disabilities who desired to obtain home and community-based services outside of private institutions, filed this action in 2005. Doc. 1.[1] In their operative complaint, plaintiffs alleged that the Director of the Illinois Department of Healthcare and Family Services and the Secretary of the Illinois Department of Human Services, in their official capacities (collectively, "State"), violated Title II of the Americans with Disabilities Act, 42 U.S.C. § 12132 ("ADA"), Section 504 of the Rehabilitation Act, 29 U.S.C. § 794(a), Title XIX of the Social Security Act, 42 U.S.C. §§ 1396-1396v, and 42 U.S.C. § 1983. Doc. 436 at 1-2.[2] They invoked the district court's subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343. *Id.* at 4. In 2011, plaintiffs, intervenors (individuals with developmental disabilities who wished to remain in private institutions without a decrease in services), and the State entered into a consent decree to resolve plaintiffs' claims. Doc. 549. The district court retained jurisdiction to enforce the decree. *Id.* at 23.

Relevant here, on August 30, 2024, the district court entered an order denying the State's Fed. R. Civ. P. 60(b)(5) motion to vacate the decree. Doc. 858. The denial was appealable under 28 U.S.C. § 1292(a)(1). *See Shakman v. Clerk of Cook Cnty.*, 994 F.3d 832, 839 (7th Cir. 2021). On September 27, 2024, the State filed a motion to amend or alter the order denying vacatur. Doc. 861 (citing Fed. R. Civ. P. 59(e)).

---

[1] The record on appeal, which is the district court's docket, is cited as "Doc. __ at __."

[2] The initial complaint also named as a defendant the Director of the Illinois Department of Public Health, Doc. 1 at 1, but he was voluntarily dismissed from the case in October 2005, Docs. 30, 32.

That motion qualified as a post-judgment motion under Fed. R. Civ. P. 59(e) because it sought to alter or amend the judgment and was timely filed within 28 days of the denial of the State's motion to vacate. *See* Fed. R. Civ. P. 59(e); *see also* Fed. R. Civ. P. 54(a) ("'Judgment' as used in these rules includes a decree and any order from which an appeal lies."). The district court denied the Rule 59(e) motion on August 1, 2025. Doc. 895.

On August 27, 2025, the State filed a notice of appeal, Doc. 897, which was timely under 21 U.S.C. § 2107(a) and Fed. R. App. P. 4(a)(4)(A)(iv) because it was filed within 30 days of the order denying the State's Rule 59(e) motion.

## ISSUE PRESENTED FOR REVIEW

Whether the district court's denial of the State's motion to vacate the consent decree should be reversed.

**STATEMENT OF THE CASE**

Filed in 2005, this case arose "in the context of a much larger debate over the proper way to provide care for the developmentally disabled." *Ligas ex rel. Foster v. Maram*, 478 F.3d 771, 772 (7th Cir. 2007); Doc. 1. What "might otherwise seem to be a question to be left to local health care officials, patients, their families, and their doctors" took on "federal significance by operation of the [ADA], among other legislation." *Ligas*, 478 F.3d at 773. Specifically, *Olmstead v. L.C.*, 527 U.S. 581 (1999), "established that it is a violation of the ADA to force developmentally disabled patients to reside in institutionalized settings when they are able to live more fully integrated into society at large and do not oppose doing so." *Ligas*, 478 F.3d at 773.

Following *Olmstead*, plaintiffs — individuals with developmental disabilities who qualified for state services, Doc. 1 at 1 — filed this lawsuit "to hasten the state of Illinois down the road to community-based care." *Ligas*, 478 F.3d at 773. They sought "redress" for the State's "practice of requiring them to reside in large, privately-run congregate care institutions . . . as a condition of receiving the long-term care services they need and for which they qualify," in violation of Title II of the ADA, 42 U.S.C. § 12132; Section 504 of the Rehabilitation Act, 29 U.S.C. § 794(a); Title XIX of the Social Security Act, 42 U.S.C. 1396-1396v; and 42 U.S.C. § 1983. Doc. 1 at 1-2.[3] Plaintiffs named as defendants the Secretary of the Illinois Department of Human Services and the Director of the Illinois Department of

---

[3] Those private care institutions were called intermediate care facilities for people with developmental disabilities or "ICFs-DD" in the district court proceedings. *E.g.*, Doc. 549 at 5. This brief calls them "intermediate facilities."

Healthcare and Family Services, the two agencies responsible for administering Illinois's programs that provide services to individuals with developmental disabilities. Doc. 436 at 1; Doc. 522-1 at 2.

**Operative Complaint**

In August 2009, plaintiffs filed the operative complaint, Doc. 436 at 1-2, which alleged that approximately 6,000 Illinois individuals with developmental disabilities lived in privately run intermediate facilities with nine or more people, which did not qualify as community settings. *Id*. at 19.[4] Plaintiffs alleged that the State over-relied on these private institutions, lacked a working plan for moving individuals from intermediate facilities into the community, did not have a waiting list for community services, and limited community services to emergencies only. *Id*. at 2-3. Further, the State did not offer Medicaid-eligible individuals a choice between obtaining services in an intermediate facility or in the community, did not use effective assessments to determine whether individuals could be served in the community, and was not informing them of feasible alternatives available under a Medicaid program known as the "Home and Community-Based Services Waiver." *Id*. at 3-4; *see Steimel v. Wernert*, 823 F.3d 902, 906 (7th Cir. 2016) ("default assumption under Medicaid is that these kinds of services will be delivered in institutions" and, thus, community-based care is a "waiver" program). The State would "advise those people who

---

[4] This brief uses "community services" to describe state services, including those under the Home and Community Based Services Waiver program, for individuals with developmental disabilities. It uses "community setting" to refer to a waiver-funded residential setting with a maximum of eight beds. *See* Doc. 549 at 3.

[sought] community services" that they were "only" available in an "emergency" situation. Doc. 436 at 2-3.

As a result, plaintiffs alleged, the State caused them and other individuals with developmental disabilities "to experience unnecessary segregation" in violation of the "integration mandates" recognized by *Olmstead*. Doc. 436 at 3. The complaint sought certification of two sub-classes, one of residents of intermediate facilities who sought to receive services in the community and a second of individuals living in a family home and "at risk" of institutionalization who sought to receive services in the community. *Id.* at 25-26.

For relief, plaintiffs requested a declaratory judgment that the State failed to provide them and other class members with "services in the most integrated setting appropriate to their needs" and lacked a "comprehensive, effectively working plan for placing" them "in less restrictive settings" in violation of the law. *Id.* at 27. Plaintiffs also sought an injunction requiring that the State: (1) maintain lists of residents of intermediate facilities and "at risk" individuals who had requested placement in community settings; (2) promptly offer to evaluate plaintiffs and class members to determine whether, in the view of qualified treatment professionals, they were both appropriate for and desired placement in community settings; and (3) promptly offer plaintiffs and class members who could handle and benefit from

community settings an option to receive supports and services to live in the most integrated setting appropriate to their needs. *Id.* at 27-28.[5]

**Settlement, Joint Motion for Class Certification, and Entry of Decree**

In January 2011, the parties filed a joint motion for class certification of the two proposed sub-classes and for approval of a proposed consent decree. Docs. 521, 522-1. They explained, without the State conceding liability, that the decree would remedy plaintiffs' claims that the State was failing "to comply with the integration mandates required by the ADA, Section 504, and Title XIX" and did "not have 'a comprehensive, effectively working plan for placing qualified persons with [ ] disabilities in less restrictive settings' as required by *Olmstead*[.]" Doc. 522-1 at 23-24.

The district court certified the two sub-classes, Doc. 525, and approved and entered the proposed decree, Doc. 549. The first sub-class consisted of adult individuals in Illinois with developmental disabilities who reside in intermediate facilities and who requested community services or placement in community settings. Doc. 549 at 2. The second sub-class consisted of adult individuals in Illinois with developmental disabilities who reside in a family home but who needed and requested community services (*e.g.*, at home) or placement in community settings. *Id.* at 2-3. The decree excluded from its class definitions individuals residing in State Operated Development Centers ("state facilities") by limiting the first subclass to individuals

---

[5] In April 2010, the district court granted limited intervention by a group of approximately 2,000 Illinois individuals with developmental disabilities who wanted to remain in intermediate facilities and who, unlike plaintiffs, sought to prevent the State from reducing the capacity of intermediate facilities. Doc. 479 at 2, 9, 12.

who reside in "private" intermediate facilities. *Id.* at 2; *see also* Doc. 737 at 3 (monitor report noting that, according to plaintiffs, "people living in [state facilities] are not part of the class action").[6]

**2011 Consent Decree**

The decree, entered on June 15, 2011, Doc. 549 at 24, imposed six primary obligations on the State.

First, the State was required to compile and maintain a database of class members — those in intermediate facilities and at home — who requested community services or placement in community settings. *Id.* at 8. Class members not residing in an intermediate facility as of June 15, 2011, were to be placed on a waiting list with selection prioritized by the urgency of need for community services or placement in a community setting, time on the waiting list, geographical considerations, and other factors. *Id.* at 9.

Second, the State was required to prepare a transition plan for each class member. *Id.* at 9-10. This included presenting each class member with alternative options to intermediate facilities and determining each class member's requested option. *Id.* at 9. Examples of alternative options included placement in a community setting or receipt of services to facilitate living in a family home. IDHS, DDD Pre-Admission Screening Manual ("DDD Manual"), Chapter 1000.30,

---

[6] The inclusion of individuals residing in state facilities in the 2011 consent decree would have drawn opposition, as 485 guardians, parents, and family members of individuals in state facilities previously objected to an earlier-proposed consent decree, Doc. 407, and guardians and family members continue to insist that state facilities are the best option for their wards, Doc. 828-1.

https://www.dhs.state.il.us/page.aspx?item=53029.[7] Examples of services available include adult day care, assistive technology, occupational therapy, physical therapy, skilled nursing, speech therapy, training and counseling services for unpaid caregivers, and vehicle modification.[8] Once options were presented, the State was to develop a transition plan specific to each class member as they were selected to transition. Doc. 549 at 9. The plans were to be completed within sufficient time to comply with deadlines set forth in the decree. *Id.* at 10.

Third, the decree set deadlines for transitioning class members residing in intermediate facilities as of June 15, 2011. *Id.*; *see also id.* at 3, 22 (defining "Approval of the Decree"). Within six years, *i.e.*, by June 15, 2017, class members residing in intermediate facilities would be transitioned to community settings consistent with their transition plans if, at the time of transition, they requested placement in a community setting. *Id.* at 10.

Fourth, the decree set deadlines for transitioning class members who did not reside within intermediate facilities as of June 15, 2011. *Id.* at 11-13. For class members residing in a family home who were in a "[c]risis" situation — *i.e.*, "at imminent risk of abuse, neglect, or homelessness" — the State was required to "promptly develop" a transition plan and ensure that the individual was transitioned "expeditiously." *Id.* at 11-12. Examples of circumstances prompting this expedited

---

[7] This court may take judicial notice of information on a government website. *Denius v. Dunlap*, 330 F.3d 919, 926 (7th Cir. 2003).

[8] IHFS, Adults with Developmental Disabilities, https://hfs.illinois.gov/medicalclients/hcbs/dd.html.

process included class members whose caregivers were deceased, class members who were homeless, and class members whose behavior put them or their family members at risk of serious harm. *Id.* The remaining members of this sub-class — *e.g.*, class members who resided in a family home and were not in "crisis" — were to be placed on the waiting list. *Id.* at 12-13. By June 15, 2017, the State would provide appropriate community services and settings for at least 3,000 individuals on the waiting list. *Id.* at 13.

Fifth, the decree required that class members on the waiting list after June 15, 2017, be selected for the appropriate community services and settings, such that they would move off the waiting list at a "reasonable pace." *Id.* at 13-14.

Sixth, the decree required the State to "implement sufficient measures to ensure the availability of services, supports and other resources of sufficient quality, scope and variety to meet [its] obligations" under the decree. *Id.* at 7. The decree did not require the State to change its "current method for establishing funding[,]" but it did require that annual budgets submitted on behalf of the Department of Human Services and the Department of Health and Family Services "request sufficient funds necessary to develop and maintain the services, supports and structures described in this Decree," and it required the State to "take steps sufficient to implement funding mechanisms that facilitate transition" between institutional and community settings. *Id.* at 7-8.

The decree also required the district court to appoint a monitor, whose duties included measuring compliance with the decree and filing annual reports. *Id.* at 16-

14

19.  And it required the State to prepare an implementation plan and annual updates thereto, with review and comment by plaintiffs and the monitor, who could submit any disputes to the court.  *Id.* at 14-16.

**Measures Taken by the State Since the Decree's Approval**

**The State Adopts a New System for Serving Disabled Individuals**

Between 2011, when the district court entered the consent decree, and 2023, when the motion to vacate was filed, the State created a new, comprehensive system that substantially expanded its capacity to provide community services and settings to individuals with developmental disabilities.  At the outset, the State increased staffing to implement the decree, including funding and fully staffing an 18-member "*Ligas* Implementation Team."  Doc. 583 at 12.

The State then redesigned its policies and procedures to remove the barriers to community integration that plaintiffs alleged in their complaint.  *Supra* pp. 9-10. Those policies and procedures, which remain in effect today, created a system that: (1) ensures that individuals with developmental disabilities and their guardians receive information about the full range of community services and settings, *see* IDHS, DDD Pre-Admission Screening Manual ("DDD Manual"), Chapter 1000;[9] (2) assesses individuals to determine their clinical eligibility for such services and settings, *see* DDD Manual, Chapter 200;[10] (3) offers individuals a choice between intermediate facilities, on the one hand, and community services and settings, on the

---

[9]  https://www.dhs.state.il.us/page.aspx?item=53029.

[10]  https://www.dhs.state.il.us/page.aspx?item=53021.

other, DDD Manual Chapter 1000;[11] (4) approves community services and settings without requiring an emergency situation, *id.*; and (5) maintains a priority waiting list from which the Department of Health and Human Services transitions individuals into community services and settings at a reasonable pace, *see* IDHS, ISC Manual, Section 3;[12] *see also* Doc. 837 at 8-9 (citing procedures).

To create and support this redesigned system, the State increased its annual spending on community services and settings for individuals with developmental disabilities from approximately $728 million per year in 2011 to $1.8 billion per year in 2023. Doc. 837 at 1; Doc. 837-1. The State substantially and repeatedly increased the hourly rates for direct support professionals, *i.e.*, the frontline workers. Doc. 837 at 15-18; *see also* Doc. 853 at 17 (not disputing the amount of the increases but disputing their sufficiency). Specifically, it implemented the following rate increases:

- FY2018: $0.75/hour

- FY2019: $0.50/hour

- FY2020: 3.5% increase

- FY2020 (mid year): $0.62/hour

- FY2021: $1.00 and $0.50/hour

- FY2022: $1.50/hour

- FY2023: $1.00/hour

---

[11] https://www.dhs.state.il.us/page.aspx?item=53029.

[12] https://www.dhs.state.il.us/page.aspx?item=115416#a_toc7.

- FY2024: $2.50/hour

Doc. 837 at 16-17; Doc. 819 at 16-17 (table of previous rate increases); Doc. 876 at 17. Additionally, the 2026 budget includes an increase of $0.80 per hour.[13] From August 2017 to present, the State increased hourly rates from $11.46 to $21.30 (~85% increase) and to $24.50 in Chicago (~113% increase).[14]

The State also increased the number of individuals served through the "waiver" program, which allows people who would otherwise be institutionalized to receive community care with reimbursement from Medicaid. Doc. 436 at 18. Whereas plaintiffs' complaint alleged that Illinois's waiver program had "only 14,000 waiver slots," *id.* at 18, by December 2023, the waiver program was supporting more than 23,000 individuals, Doc. 853-9 at 18. And as of June 30, 2025, the number was more than 25,000.[15]

The Department also continued to add and enhance services to better serve individuals with higher needs. For example, as of November 2023, the State updated nursing services calculations to increase the number of nursing hours reimbursed to providers for insulin support. Doc. 837 at 32; Doc. 876 at 7-8. The State continued to

---

[13] IDHS, Ligas Data Report as of June 30, 2025 (issued Aug. 15, 2025), https://www.dhs.state.il.us/page.aspx?item=174856.

[14] IDHS, DDD Rate Table, https://www.dhs.state.il.us/page.aspx?item=38992 (DSP – Awake) (last modified Aug. 1, 2017); *see also* IDHS, DDD Rate Table (effective Jan. 1, 2026), https://www.dhs.state.il.us/page.aspx?item=176268 ("DSP Residential" rates).

[15] IDHS, Persons Served – End of Fiscal Year (FY13 to F25), https://www.dhs.state.il.us/page.aspx?item=166653.

expand short-term stabilization homes and to develop long-term stabilization homes for class members who need more intensive behavioral support. Doc. 819 at 5; Doc. 876 at 7-8. And in July 2024, it unveiled a new rate methodology to "ensure the rates reflect the current needs of individuals."[16]

**The District Court, Monitor, and Plaintiffs Recognize Strong Efforts**

The State's efforts had the intended impact. In plaintiffs' words, between the decree's entry and October 2023, the State "served almost 13,000 class members" by "moving people out of private [intermediate facilities], uncapping the number of people served through crisis funding, and providing services to people selected from the [ ] waiting list." Doc. 829 at 1. The district court observed, in July 2024, that Illinois's system for providing individuals with developmental disabilities access to community services and settings had improved so much that although certain individuals may have his or her "own individual case, but as far as the system as a whole, where we were when I started in on this case, we are nowhere where we were before." Doc. 859 at 10.

The monitor likewise recognized the State's efforts, and the success of those efforts, in the annual reports. In the first report, filed in 2012, the monitor explained that although faced with a "seemingly Sisyphean task," the State had undertaken a "systematic approach toward compliance with the Decree." Doc. 565 at 6; *see also id.* at 7 (State's "strong efforts" "established a foundation upon which substantial

---

[16] IDHS, Ligas Data Report as of June 30, 2025 (issued Aug. 15, 2025) https://www.dhs.state.il.us/page.aspx?item=174856.

compliance can be obtained and sustained over time"). His following reports continued to praise the State for its "strong" efforts and "can do" attitude. *See, e.g.*, Doc. 571 at 7-8, 42; Doc. 583 at 7, 48.

Even during the budget impasse of 2015 through 2017, when most state vendors were "being paid months late, if at all," the State made sure that vendors and providers involved with the decree were paid "in full and more promptly" than before the impasse. Doc. 681 at 11-12. During this time, the new monitor praised the State for its "unfailing" and "ongoing cooperation" and "immediate follow-ups in all cases." Doc. 627 at 3, 21; Doc. 646 at 2.[17] She also found that the State met or exceeded the decree's deadlines for transitioning class members to community settings or services. *E.g.*, Doc. 627 at 14, 29, 39; Doc. 646, at 23, 39. Despite "the best efforts of truly committed professionals," however, the monitor stated that due to budget restraints and low hourly rates for care workers, there was a staffing shortage at private facilities. Doc. 627 at 21.

### Subsequent Measures to Address Wage Rates, "Reasonable Pace," and the Monitoring Tool

In April 2017, plaintiffs and intervenors filed a motion asking the district court to order the State to increase hourly rates for care workers. Doc. 666-1 at 1, 38-39. The district court granted the motion in part, holding that it lacked authority to order increase in wages but ordering the State to "devise a plan to address the issues causing the reduction in services and to bring the State into substantial compliance"

---

[17] In June 2015, the initial monitor resigned and was replaced by a new monitor. Doc. 593.

with the decree.  Doc. 695 at 2-3.  Further to that order, in June 2018, the court ordered the parties to convene a working group, which would include the monitor and other stakeholders, to study the wage rates and funding methodology for staffing at facilities, as well as to develop a monitoring tool to assess whether services, funding, and administration were adequate.  Doc. 710 at 2-3.  The court also ordered the parties to develop criteria for satisfying the decree's requirement that class members on the waiting list after June 15, 2017, be selected for the appropriate community services and settings at a "reasonable pace."  *Id.* at 3.

As directed by the district court, the State took measures to address wage rates.  In August 2018, it convened a "*Ligas* Rates Oversight Committee" to study wage rates and funding methods.  Doc. 747 at 3.  The Committee issued a final report with recommendations in November 2019, which led the State to retain an outside consultant, Guidehouse Inc., to develop "recommendations for new rate methodologies" for setting wages for workers in community settings and intermediate facilities, Doc. 747-1 at 3, which Guidehouse did through a final report, Doc. 747-2.

While the State generally agreed with Guidehouse's recommendations, it explained that they would "need to be phased in over a number of fiscal years beyond the five years recommended" because they would cost "hundreds of millions of new dollars" and would "have to be included in the Governor's introduced budgets" and would be subject to appropriation by the General Assembly and other State budget demands.  Doc. 747 at 4.  In August 2021, the parties informed the district court that

the State had identified an additional $170 million that it would put toward addressing Guidehouse's recommendations and provided a projected timeline for implementing the recommendations, subject "to constitutional, fiscal/budgetary, statutory, and regulatory constraints." Doc. 754 at 2-3, 5. And as explained, by late 2023, the State had substantially and consistently raised hourly rates and planned further rate increases, which have been implemented through 2026. *Supra* pp. 16-17.

In response to the district court's order requesting a monitoring tool to "assess adequacy of services, funding, and administration," Doc. 710 at 2, the monitor developed a survey referred to as "*Ligas* Compliance Measures for People Living in CILAs" (community integrated living arrangements), Doc. 766 at 49-51. Relying on the responses of 225 class members living in community settings, the survey sought to measure nearly 200 topics in 17 domains. Doc. 751 at 24; Doc. 807 at 7-32. The topics, many of which reflect best practices, were not tied to specific decree provisions or *Olmstead*. *See, e.g.*, Doc. 807 at 7-32 (topics included whether the private facilities had landscaping that is "well kept," were "odor free," and had visible "mementos").

The parties also addressed the "reasonable pace" requirement. The State developed a plan, and in May 2019, the parties and the monitor agreed on metrics for evaluating whether individuals who remained on the waiting list were being transitioned at a "reasonable pace." Doc. 719 at 29-30. Specifically, the State agreed to prioritize selections from the waiting list so that by the 2025 fiscal year, "no individual will wait on [the waiting list] for over 60 months," and agreed to serve at

21

least 3,120 additional individuals on the waiting list between 2020 and 2025, or 630 individuals per year (with a minimum of 600 in fiscal year 2020). *Id.*

In August 2021, the parties submitted a joint status report confirming that "the State continues to meet and exceed the Reasonable Pace requirements" despite the Covid-19 pandemic. Doc. 754 at 6-7. At the time of the motion to vacate, the State had exceeded the requirement to serve at least 630 people off the waiting list each year by serving 708, 764, and 759 people in fiscal years 2021, 2022, and 2023, respectively. Doc. 853-9 at 10. As of December 2023, more than 13,850 class members had been selected from the waiting list, Doc. 853-9 at 5, and only 8 out of 5,391 individuals (0.15%) on the waiting list had been seeking services for more than 60 months, *id.* at 10. And as the State informed the court, it has continued to exceed its reasonable pace obligations since the motion was filed, with 767 and 731 class members entering service in fiscal years 2024 and 2025. Doc. 930 at 6.

**As the District Court Sought an "Exit Plan," the Monitor Identified Only Three Remaining Issues**

In June 2023, the district court sought to determine how the parties could "resolve this matter such that the consent decree is no longer needed." Doc. 806. To that end, the court ordered the monitor to file a report that included "a discussion of the original scope of the case, class, and consent decree; an explanation of the current issues facing the parties which justify that the consent decree remain open; and the Monitor's recommendations regarding who belongs in the class and how to address these relevant issues." Doc. 806. It also required the parties to file responses to the monitor's report. *Id.*

The monitor filed the required report in August 2023, Doc. 808, including the required explanation of the "issues . . . which justif[ied] that the decree remain open," Doc. 806. The monitor identified only three discrete issues, impacting less than 1% of the class. Doc. 808 at 5-24.

First, the monitor stated that the State was not meeting its obligation to expeditiously serve class members in "[c]risis" situations. Doc. 808 at 5-6 (citing Doc. 549 at 14). Specifically, the monitor reviewed data for 301 crisis requests from July 2, 2021, to December 31, 2022, and acknowledged that, "for the most part," review of crisis requests was timely (more than 90% were reviewed "within 1 day" and more than 95% within 3 days). *Id.* at 7. But because 59 people did not receive service authorization within 3 days (40 received authorization within 4-9 days), and because the data the monitor reviewed did not include certain individuals for whom a provider had not been secured, the monitor concluded that the State had not met its obligations. *Id.* at 8-10. In other words, the monitor relied on the State's handling of crisis requests from 59 individuals, or less than 0.30% of the class, Doc. 853-9 at 2 (class size of 20,299 as of December 31, 2023), to recommend that the decree continue.

Second, the monitor raised issues about state facilities, which are not a subject of the decree. *See supra* pp. 11-12. Nevertheless, the monitor reported that she had visited state facilities and conducted interviews with their staff and residents. Doc. 808 at 21. She noted that, between 2017 and 2023, there were 195 class members, or less than 1% of the class, residing in state facilities. *Id.* at 12-13; *see also id.* at 14

(noting that 139 of those 195 class members were in state facilities because their "guardian [would] not agree to placement"). But because a majority of those placed in state facilities were approved for community services or settings, the monitor was "great[ly] concern[ed]" that they were residing in state facilities. *Id.* at 12.

Third, based on work that the State had itself undertaken to improve its services, the monitor expressed concern that there were "insufficient community services." *Id.* at 18. This determination rested on recommendations that came from outside consultants at the University of Illinois-Chicago, after the State sought recommendations for improving its capacity to serve individuals with more complex needs (*e.g.*, those with diabetes). *Id.* at 18-19. Relatedly, in a separate filing that included the survey results, she stated that results of the monitoring tool indicated insufficient quality of care in community settings. Doc. 807.

Finally, the monitor declined to offer a proposed exit plan, instead indicating that her "quality review this year, along with the POCAs (Plans of Corrective Action) to come," which addressed the quality of services in the community settings covered by the 225-person survey, *supra* p. 21, would "likely help to lead to next steps on a reasonable Exit Plan." Doc. 808 at 23-24.

Plaintiffs filed a response to the monitor's report in which they explained that before the decree, class members "were either institutionalized in private [intermediate facilities] or were at risk of being institutionalized." Doc. 829 at 3. According to plaintiffs, at that time, the "only" choice offered by the State to individuals with developmental disabilities who needed services was

institutionalization. *Id*. Thus, "[t]he purpose of the case was" to ensure that individuals with developmental disabilities had "a real and meaningful choice to receive services in the community." *Id*. Plaintiffs acknowledged that "considerable progress" had been made toward that goal. Doc. 829 at 1. They acknowledged that, since the decree was entered, the State had "served almost 13,000 class members," by moving individuals out of intermediate facilities, lifting the cap on the number of people who could receive crisis funding, and providing services to those on the waiting list, while also reducing the wait list times. *Id*.

However, plaintiffs identified "serious problems" that, in their view, required continued judicial oversight: namely, the State was "failing to develop and provide sufficient community services for Class Members with higher needs or who are in crisis" and "failing to provide timely and appropriate community services for Class Members who are living in the community." *Id*. Like the monitor, plaintiffs declined to identify a concrete path for ending the decree. Instead, plaintiffs proposed that the parties and the monitor should develop "compliance indicators on the issues raised" in their response and "anything else required to exit this Decree" to "provide benchmarks and clear expectations, ensuring both parties have a well-articulated road map for achieving compliance." *Id*. at 19-20.

The State also filed a response to the monitor's report, explaining that it believed that it had substantially complied with the decree and implemented a durable remedy. Doc. 828 at 5-17. The State addressed each of the issues raised by the monitor, *id*. at 17-22, and it proposed a motion to vacate under Fed. R. Civ. P.

60(b)(5) as a path to ending the decree, *id.* at 4-5.  Following a hearing, Doc. 834, the district court set a briefing schedule on the State's proposed motion, *id.* at 20.

**Motion to Vacate**

In December 2023, the State filed its motion to vacate the consent decree, which argued that Rule 60(b)(5)'s standards for obtaining relief from a judgment or order were met for two independent reasons:  (1) the decree had been "satisfied," and (2) "applying it prospectively [was] no longer equitable."  Doc. 831 (motion); Doc. 837 at 5.  First, relying on *Shakman v. Pritzker*, 43 F.4th 723 (7th Cir. 2022), and *Peery v. City of Miami*, 977 F.3d 1061 (11th Cir. 2020), the State argued that it had "satisfied" the decree because it had achieved the decree's objectives by implementing a durable remedy that eliminated the "systemic barriers" to community integration that the decree sought to remove and because it had "substantially complied with the [d]ecree's terms."  *E.g.*, Doc. 837 at 5-8.  Second, relying on *Shakman* and *Horne v. Flores*, 557 U.S. 433 (2009), the State argued that decree should be vacated on equitable grounds because the State had made changes that both remedied the underlying alleged violations of federal law and that would minimize the risk of future systemic violations of the law.  *E.g.*, Doc. 837 at 5-8, 10-11, 33-34.

In support, the State described the comprehensive changes it had implemented, including that it had:

- established a comprehensive, working system that informs individuals with developmental disabilities of available services; assesses individuals' clinical eligibility; offers a choice between community services and settings, on the one hand, and intermediate facilities, on the other; approves community services and settings without an

emergency or crisis; has a waiting list; and moves individuals off the waiting list at a reasonable pace, *id.* at 1, 8-9;

- substantially increased the capacity of home and community-based waiver services, *id.* at 1, 13;

- convened a rates oversight committee, engaged independent consultants to make hourly rate recommendations, and took steps to implement those recommendations through substantially increasing hourly rates for care providers, with the plans and commitment to continue the increases in the coming years, *id.* at 15-18;

- using the metrics created by the monitor's review tool — which covers more than 200 topics and seeks to assess quality of services and best practices, rather than statutory or constitutional requirements — improved survey compliance rates from an average of 61% in 2019 to 79% in 2022 and 2023, *id.* at 20; and

- removed the cap on crisis services and expanded their availability such that by 2021-2022, the State was fulfilling 99% of crisis services requests, *id.* at 9, 21, 25;

- to support these systemic changes, increased annual spending on community services and settings from $728 million to more than $1.8 billion, Doc. 837 at 1, 13.

The State explained that the "fundamental objective" of the decree was to ensure that the State removed the systemic barriers that prevented class members living in intermediate facilities or in family homes from obtaining community services in their family home or in a community setting. *Id.* at 8. The barriers identified by plaintiffs were the lack of a comprehensive plan for providing individuals with community services and settings, not offering community services and settings except in emergency situations, not informing individuals of their options for community services and settings, and not maintaining a waiting list from which individuals are offered community services and settings with reasonable promptness. *Id.* at 2 (citing Doc. 436 at 2-4, 20-25). The State further explained

that, under the oversight of the court and monitor, the State had removed those systemic barriers in a durable manner through the changes it had made over the life of the decree. *Id.* at 8-9.

Turning to the specific terms of the decree, the State explained that plaintiffs had not previously disputed that it had substantially complied with five out of the six primary provisions of the decree, and thus the State focused its discussion on the sixth provision, *id*. at 2-3, 9, which required the State to develop sufficient measures to ensure the availability of services and supports for individuals with developmental disabilities, Doc. 549 at 7-8. The State argued that it had substantially complied with this obligation through the many changes identified above, including the significant spending increases, increased hourly rates, and expansion of the waiver program. Doc. 837 at 12-32. Finally, the State argued that even though issues may arise in individual cases, its system-wide changes eliminated systemic barriers to community integration and demonstrated a "commitment to maintaining existing remedies that are more than adequate to avoid systemic future [federal law] violations." *Id.* at 33. Thus, the State added, even if the district court determined that the State had not satisfied the decree, equitable considerations warranted vacatur. *Id.* at 33-34; *see also id.* at 8, 10.

Plaintiffs opposed the motion to vacate. Doc. 853. They primarily argued that the State had not satisfied the decree's sixth provision, *id.* at 16-30, stating that the State's annual spending increase of $1 billion was not "*remotely* sufficient" to the bring it "into compliance" given inflation and the "dismal" starting point, *id.* at 19

(emphasis in original). They noted that the State had only partially implemented the hourly rate increases recommended by Guidehouse, *id.* at 16-18; that some class members were residing in state facilities instead of in the community, *id.* at 21-23; that out of a class of approximately 20,000 people, 109 class members in a "crisis" situation were waiting for assistance, *id.* at 23-25; that 36 class members who were living in intermediate facilities in June 2011 were still in intermediate facilities, *id.* at 27; and that certain community settings had not met an 85% compliance rate according to the results of the monitoring tool survey, *id.* at 28-30. Additionally, despite having agreed in August 2021 that the "State continue[d] to meet and exceed the Reasonable Pace requirements," Doc. 754 at 6 (joint status report), plaintiffs reversed that position and argued that the State was not in compliance with these requirements, *id.* at 11-13. Finally, with respect to the equitable grounds for vacatur, plaintiffs argued that the State had only raised the first "satisfied" ground of Rule 60(b)(5), Doc. 853 at 3, and thus that the State "err[ed]" by suggesting that the court could grant the motion based on a showing that there is "no longer an ongoing violation of federal law," *id.* at 4.

The monitor also filed a response to the motion to vacate raising largely the same issues stated in her August 2023 report, Doc. 831, but adding that the State had not "fully complied" with the "reasonable pace" obligation, *id.* at 19.

In July 2024, the district court heard oral argument on the motion. Doc. 857; Doc. 859 (transcript). The court observed, and the monitor agreed, that the State had improved the system such that, although certain individuals may still need more

29

assistance, "as far as the system as a whole," it was "nowhere" as it was when the court began its supervision.  *Id.* at 10.  Nevertheless, in August 2024, the district court denied the motion to vacate in a minute order.  Doc. 858.  The court concluded without analysis that the State had "not met its burden to show that the consent decree should be terminated."  *Id.*

**Motion for Reconsideration**

In September 2024, the State filed a motion for reconsideration under Fed. R. Civ. P. 59(e).  Doc. 861.  First, relying on *Horne*, 557 U.S. 433, the State argued that a ruling on a Rule 60(b) motion to vacate a consent decree must contain analysis of the applicable standard and the factual record, and the district court thus erred by not making factual findings and evaluating them under the appropriate legal standard. *Id.* at 2-4, 6.  Second, the State argued that, applying the correct legal standard, the decree should have been vacated because the State had satisfied the decree by implementing a durable remedy that achieved the decree's objectives, and by substantially complying with the decree's terms, and because equitable considerations separately warranted termination of the decree.  *Id.* at 5-6.  Finally, as an alternative to vacatur, the State asked the court "to clarify what additional obligations the Court finds Defendants are not complying with, so that Defendants can be sure that they are addressing those obligations."  *Id.* at 7.

The motion for reconsideration remained pending for 10 months.  Doc. 895. During that time, the second monitor resigned, the district court appointed a third monitor, and the court directed the new monitor to submit a report that addresses,

among other things, "what constitutes 'substantial compliance' under the consent decree," "usage and placement of class members in [state facilities]," and potential metrics for measuring substantial compliance. Doc. 887. Noting the monitor's report and that the parties were still following the decree, the court held in a minute order that the State's motion for reconsideration was "over taken by events" and struck it as "moot." Doc. 895.

The State appealed. Doc. 897.

**The State Has Continued to Improve Its System**

Since the motion to vacate, the State has continued to improve its system for supporting people with developmental disabilities in the community. As of October 2025, the State had served 14,449 class members under the *Ligas* system. Doc. 918 at 2. More than 8,600 class members had entered waiver services through selection from the wait list, and 4,319 class members received crisis funding. *Id.* As of August 2025, only 100 class members, less than 1 percent of the class, were seeking to transition from a state facility with guardian consent. *Id.* at 4. And the State continued to exceed its "reasonable pace" obligation in fiscal years 2024 and 2025. Doc. 930 at 6.[18]

---

[18] Moreover, because data is updated as received, the 2025 submission reflects that the State served more individuals in fiscal years 2022 and 2023, than it originally reported at the time of the motion.

## SUMMARY OF ARGUMENT

The decree should be vacated for two separate reasons.  First, the State satisfied the decree because it achieved the decree's objectives through a durable remedy, and because it substantially complied with the decree's terms.  Namely, the State has eliminated the alleged systemic barriers to community integration that the decree sought to address.  It has done so by redesigning its policies and procedures and investing billions of taxpayer dollars to create the capacity to serve class members in the community.  These systemic changes are not temporary fixes but reflect a long-term, good-faith commitment that has provided more than 13,000 class members with the community-based care sought by this lawsuit and that avoids future systemic violations of federal law.

Second, equitable considerations independently warrant vacatur.  Because the State eliminated the systemic barriers that formed the alleged statutory violations and the basis for systemwide relief, prospective enforcement is not supported by an ongoing systemic violation of federal law, and thus inequitable.  Decree proceedings have shifted to individual class member issues, increasingly intrusive supervision of state operations, attempts to exercise control over the State's budget, and issues outside the scope of the complaint and decree.  This shift from ensuring the State eliminates an alleged ongoing violation of federal law to generalized oversight exceeds the limited role that Article III creates for federal courts and raises federalism concerns.  This court should reverse the district court's unreasoned order denying the State's motion to vacate.

## ARGUMENT

**I.    The court reviews the denial of a Rule 60(b)(5) motion for abuse of discretion but reviews legal questions *de novo*.**

A district court may vacate a consent decree under Rule 60(b)(5) if the decree has been satisfied or if applying it prospectively is no longer equitable. *Shakman*, 43 F.4th at 728. The party seeking relief bears the burden of establishing that relief is warranted. *Horne*, 557 U.S. at 447. This court reviews the denial of a Rule 60(b) motion for abuse of discretion. *Id.* But the court reviews legal questions underlying that determination *de novo*, *Philos Techs., Inc. v. Philos & D, Inc.*, 802 F.3d 905, 911 (7th Cir. 2015), including the proper interpretation of the consent decree, *Holmes v. Godinez*, 991 F.3d 775, 780 (7th Cir. 2021). If the movant establishes that relief is warranted, a court abuses its discretion when it refuses to modify an injunction or consent decree. *Horne*, 557 U.S. at 447.

**II.   The district court should have vacated the decree because the decree has been satisfied.**

The State should be released from the decree because it has been "satisfied." Fed. R. Civ. P. 60(b)(5). In determining whether the State has satisfied a consent decree, the "controlling question" is whether State has "achieved" or "satisfied" the decree's "objectives" and implemented a durable remedy to "avoid systemic future . . . violations" of the rights vindicated by the decree. *Shakman*, 43 F.4th at 728, 730; *see also Peery*, 977 F.3d at 1075. Here, the State has satisfied the decree by achieving its objectives and implementing a durable remedy to remove systemic obstacles to class members obtaining state benefits without residing in an institution. *See infra* pp. 34-37. Moreover, the State has substantially complied with the decree's terms,

*see infra* pp. 37-42; *see also Shakman*, 43 F.4th at 728 ("Once a party has shown that it has substantially complied with the terms of the decree and implemented a durable remedy, continued enforcement of the order is . . . improper.").

### A.     The State satisfied the decree.

#### 1.     The State achieved the decree's objectives and implemented a durable remedy.

The decree has been satisfied because the State has achieved its objectives and implemented a durable remedy to eliminate systemic violations and avoid them in the future. *See Shakman*, 43 F.4th at 728, 730. Satisfaction does not require "strict and literal compliance" with the decree's provisions. *Peery*, 977 F.3d at 1075. Nor does it require the State to "prove a negative" of showing "that no [statutory] violations, whether measured at the individual level or more systemically, have recently occurred or will recur" — let alone prove perfect compliance with the decree. *See Shakman*, 43 F.4th at 730. Instead, a consent decree is satisfied when its "fundamental purpose has been accomplished" and any deviations from the decree do not "substantially . . . defeat the object which the parties intend[ed] to accomplish." *Peery*, 977 F.3d at 1075.

The fundamental purpose of this decree was to eliminate systemic barriers that prevented compliance with the statutory "integration mandates," as interpreted by the Supreme Court in *Olmstead v. L.C.*, 527 U.S. 581, and to offer class members the option of receiving services outside of intermediate facilities. *See, e.g.*, Doc. 522-1 at 2, 23-24. Plaintiffs' complaint alleged that, in violation of the "integration mandates" identified in *Olmstead*, the State was requiring class members to reside in

intermediate facilities as a condition of receiving the long-term care for which they qualified. Doc. 436 at 1-3. Likewise, in support of the joint motion for approval of the decree, the parties confirmed that the decree was intended to address plaintiffs' claims that the State was "fail[ing] to comply with the integration mandates required by the ADA, Section 504 and Title XIX" because, at the time, the State lacked "a comprehensive, effectively working plan for placing qualified persons with disabilities in less restrictive settings as required by *Olmstead*." Doc. 522-1 at 23-24.

The State has removed each of the barriers that plaintiffs identified. Today, the State's comprehensive system: (1) informs individuals with developmental disabilities and their guardians of the full range of community services and settings; (2) assesses individuals to determine their clinical eligibility for such services and settings; (3) offers individuals a choice between receiving services in the community or in intermediate facilities; (4) approves community services and settings without requiring a crisis situation; and (5) maintains a priority waiting list from which it moves individuals into community services and settings at a reasonable pace. *See supra* pp. 15-16; *see also* Doc. 436 at 2-4, 20-25 (complaint identifying barriers).

Indeed, over the past 15 years, the State has worked diligently with plaintiffs, intervenors, three court monitors, two district court judges, a magistrate judge, outside consultants, a rates oversight committee, and many others to transform its system for making community services and settings available to developmentally disabled individuals. The State created and staffed a new 18-member team to implement the decree, increased its annual spending by more than a billion dollars,

substantially increased the number of individuals who can receive community services and settings through changes to the waiver program and by removing caps on the number of individuals who can receive crisis services, implemented a priority-based waiting list for individuals eligible for community services and settings, substantially increased hourly rates for front-line care providers, and made numerous other improvements to improve care for individuals with developmental disabilities. *Supra* pp. 15-22.

Even plaintiffs recognized that, as a result of the State's efforts since the decree, the "State ha[d] served almost 13,000 Class Members" by October 2023, "[t]hrough moving people out of [intermediate facilities], uncapping the number of people served through crisis funding, and providing services to people selected from the State's [Priority] waiting list[.]" Doc. 829 at 1. Likewise, in July 2024, the district court observed — and the monitor agreed — that the system had improved such that while there might be individual class members who had not yet obtained relief, the "system as a whole" was "nowhere" near where it was when the court inherited the case in 2015. Doc. 859 at 10. Thus, because the State implemented "a comprehensive, effectively working plan for placing qualified persons with disabilities in less restrictive settings as required by *Olmstead*," Doc. 522-1 at 23-24, the State achieved the objectives of the decree.

The State's transformation of its system for placing individuals with developmental disabilities in the community is also a "durable" remedy. The "durable remedy" requirement reflects that "fleeting" compliance with federal law

would not warrant vacating a consent decree.  *Jackson v. Los Lunas Community Program*, 880 F.3d 1176, 1203 (10th Cir. 2018).  Thus, the durable remedy requirement placed the burden on the State to demonstrate that it had engaged in "sustained good-faith efforts to remedy federal violations and, to the extent possible, eliminate the vestiges of the federal violation." *Id.*

The State carried that burden here.  It showed that the changes it implemented and results it achieved are permanent, not fleeting.  The policies and procedures the State adopted remain in place, *supra* pp. 15-16, its funding and rate increases to pay care workers have increased year over year, *supra* pp. 16-18, it has consistently met its reasonable pace obligations, *supra* pp. 21-22, and the number of class members served has continually increased, *supra* pp. 17-18, 31.  The State's good-faith commitment to remedying the violations of federal law alleged in plaintiffs' complaint is further confirmed by the monitors' observations of its consistent efforts, *supra* pp. 18-19, and the State's repeated decision to prioritize funding for decree compliance even in times of a budget crisis, *supra* pp. 19.

Because the State carried its burden of showing that it satisfied the decree by achieving the decree's objectives with a durable remedy, *see Shakman*, 43 F.4th at 730, the district court should have granted the State's motion to vacate.

> **2.    The State substantially complied with the terms of the decree.**

In addition, the State substantially complied with each of the decree's primary obligations.  *Supra* pp. 12-15 (summarizing obligations).  As explained, substantial compliance does not require "strict and literal" compliance with the contract

provisions. *Peery*, 977 F.3d at 1075. Likewise, isolated issues do not preclude a finding of substantial compliance, as systemwide relief requires systemwide problems. *See Salazar by Salazar v. D.C.*, 896 F.3d 489, 500 (D.C. Cir. 2018) ("[e]xpansive, classwide structural relief that judicially superintends local government operations cannot issue" based on "one-off errors"); *see also Lewis v. Casey*, 518 U.S. 343, 359-60 (1996) (systemwide relief requires systemwide impact); *Shakman*, 43 F.4th at 731 ("We cannot let perfect be the enemy of the constitutionally adequate."). Instead, courts should be mindful that "case-by-case resolution and accountability is the norm from the perspective of our national Constitution," and that even after a consent decree's vacatur, the courts remain open for future claims. *Shakman*, 43 F.4th at 731.

First, there is no question that the State substantially complied with the first major provision, *supra* p. 12, by compiling a list of class members, creating and maintaining a database of individuals who had requested community services and settings, and placing those who were not residing in an intermediate facility as of June 15, 2011, on a waiting list. The monitor did not identify this as one of the three issues that she believed justified keeping the decree open in her August 2023 report, *supra* pp. 22-24, and plaintiffs did not raise it in their response to the State's motion to vacate. *See generally* Doc. 853 (plaintiffs' response to the motion to vacate, which did not argue noncompliance with this decree provision); *see Paradigm Care & Enrichment Ctr., LLC v. West Bend Mut. Ins. Co.*, 33 F.4th 417, 422 (7th Cir. 2022) (argument not made in district court is forfeited). In fact, the State provided

plaintiffs and the monitor with the waiting list in July 2011, and it has continued to maintain the list since then. *See, e.g.*, Doc. 819 at 3; Doc. 775 at 3.

Second, the State substantially complied with its obligation to create a transition plan for each class member. *See supra* p. 12; Doc. 549 at 9-10. Again, this was not one of the three issues that the monitor said justified keeping the decree open in her August 2023 report. *Supra* pp. 22-24. In January 2018, the State implemented a planning process for transitioning qualified individuals, and that process continues to be used. Doc. 775 at 17-18; Doc. 819 at 20-21. Indeed, the State has continued to improve the process, including most recently by adopting recommendations made by outside consultants affiliated with University of Illinois at Chicago. Doc. 819 at 21. Although plaintiffs argued in response to the motion to vacate that the State had not proven compliance with this aspect of the decree, they did not identify any specific shortcomings with the State's transition planning. *See* Doc. 853 at 15-16.

Third, the State substantially complied with the requirement that it transition class members residing in intermediate facilities as of June 15, 2011, to community settings by June 15, 2017. *See supra* p. 13; Doc. 549 at 10. This likewise was not an issue the monitor identified as warranting keeping the decree open in August 2023. *Supra* pp. 22-24. On the contrary, the monitor's report filed in December 2018 recognized that, for this obligation, "in all cases the Defendants exceeded their target numbers through [June 15, 2017]" — although there were some remaining individuals represented by the Office of the State Guardian for whom it was still

being determined whether they wished to move from intermediate facilities to the community.  Doc. 717 at 24.  At the time of the State's motion to vacate, plaintiffs identified 36 members of this sub-class — which consisted of 1,558 class members, Doc. 775 at 16 — who had not yet transitioned, Doc. 853 at 27, and 27 of those 36 had "just recently expressed their interest in transitioning," Doc. 856 at 7 n.6.  Thus, although the State is working, and will continue to work, to transition the remaining class members, the State is nonetheless in substantial compliance with this provision because it has transitioned the vast majority of class members.  *See supra* pp. 37-38 (vacatur does not require perfection and systemwide relief cannot rest on isolated errors).

Fourth, it is undisputed that the State substantially complied with the requirement that within the first six years of the decree, it provided community services and settings to at least 3,000 individuals who were not residing in intermediate facilities as of June 15, 2011.  *See supra* p. 13; Doc. 549 at 11-13; *see generally* Doc. 853.  This was not one of the three issues that the monitor said justified keeping the decree open in her August 2023 report.  *Supra* pp. 22-24.  Nor did plaintiffs contest the State's compliance with this fourth obligation.  *See generally* Doc. 853.  Indeed, documents including the monitor's prior reports reflect that "[d]uring the first six years of the Decree, the benchmark of serving 3,000 individuals currently-living at home . . . was achieved."  Doc. 775 at 5; *see also* Doc. 717 at 35 (monitor noting that the State "exceeded" this requirement and, as of June 30, 2018,

the State had selected 5,924 class members from the waiting list and 3,590 had begun receiving waiver services).

Fifth, for individuals on the waiting list after June 15, 2017, the State substantially complied with the requirement to move them off the list at a "reasonable pace." *See supra* p. 14; Doc. 549 at 13-14. As explained, pp. 22, in August 2021, the parties filed a joint report stating that the State was continuing to meet and exceed its reasonable pace obligations. Doc. 754 at 6-7. And neither plaintiffs nor the monitor disagreed when the State told the district court in July 2022 and October 2023 that it was continuing to meet those obligations. Doc. 775 at 19; Doc. 819 at 22. And this was not one of the three issues that the monitor identified in her August 2023 report on the issues that justified keeping the decree open. *Supra* pp. 22-24. In fact, as of December 2023, only 8 out of 5,391 individuals then on the waiting list had been seeking services for more than 60 months, Doc. 853-9 at 10. This represented substantial compliance with the parties' agreement that, to satisfy the decree's reasonable pace requirement, the State would prioritize selections from the waiting list so that by the 2025 fiscal year, no individual would be on the waiting list for more than 60 months. Doc. 719 at 29-30. Moreover, the State exceeded its obligations to provide services to more than 630 individuals selected from the waiting list each year through 2025. *Supra* p. 22.

Sixth, the State substantially complied with the requirement that it implement sufficient measures to ensure availability of "services, supports, and other resources," including by requesting in annual budgets sufficient funds to "develop

and maintain" those services and supports. *See supra* p. 14; Doc. 549 at 7-8. As explained, the State created the appropriate structures, designing and implementing a system in which class members are informed of their community-based options; assessed for eligibility; offered a choice between intermediate facilities, on one hand, and community services and settings, on the other; and, if not served immediately, placed on a waiting list from which they are served at a reasonable pace. *Supra* pp. 15-16. Additionally, the State significantly increased investments in community services and settings, including by implementing guidance from outside consultants on rate methodologies, substantially increasing wage rates, planning additional rate increases that have now been implemented, expanding the capacity of the waiver program, and significantly increasing annual spending. *See supra* pp. 16-18; *see also* Doc. 837-1 (showing year-over-year budget increases). In her August 2023 report, the monitor identified three issues relating to resources that she believed precluded a finding of substantial compliance with this obligation. *See generally* Doc. 808. As now explained, *infra* pp. 43-47, each of these issues either impacts less than 2% of the class members or is not required by the Constitution, any statute, or the decree itself. Because the State has achieved the decree's objectives through a durable remedy, and substantially complied with the terms of the decree, the district court should have granted the State's motion to vacate the decree.

**B.** **The issues the monitor and plaintiffs identified do not support the district court's decision denying the State's motion to vacate.**

After the district court sought an "exit plan" for ending the consent decree, the monitor identified three issues relating to the State's compliance with its sixth decree obligation that, in her view, warranted keeping the decree open, Doc. 808, and plaintiffs presented additional arguments for why the decree should not be vacated. Doc. 853 at 10-31. Although the district court did not provide its reasoning when denying the State's motion to vacate, Doc. 858, and delegated to a new monitor the question of "what constitutes 'substantial compliance' under the consent decree," Doc. 887, the issues identified by the monitor and plaintiffs cannot provide a rationale for the district court's decision.

Primarily, the monitor and plaintiffs contended that the State had not satisfied the decree's sixth requirement because it had not implemented sufficient measures "to ensure the availability of services, supports, and other resources of sufficient quality, scope and variety" to serve class members under the decree. Doc. 853 at 16-30. But this argument impermissibly rested on issues that affected only a small percentage of individuals. For example, the plaintiffs pointed to 36 original class members who were still residing in intermediate facilities, and who had not yet transitioned to the community. Doc. 853 at 27 at 27.[19] Those 36 represented only slightly more than 2% of the original class members who sought to transition from

---

[19] Plaintiffs' brief identified 32 such class members, Doc. 853 at 27, but the State's reply brief clarified that the number was 36, with 27 having "just recently expressed their interest in transitioning." Doc. 856 at 7 n.6.

intermediate facilities.  Doc. 775 at 16 (1,558 original class members as of April 2021).  Similarly, plaintiffs identified "109 individuals living in their family home" who had "contacted their [independent service coordinators] in crisis" but were in "pending status.''  Doc. 853 at 23-25.  But, again, 109 individuals represented approximately 0.5% of the total class.  Doc. 853-9 at 2; *see also* Doc. 942 at 2 (noting recent improvements).  The monitor and plaintiffs thus did not — and could not — identify systemic failures precluding termination of the decree; instead, the evidence established that the State had successfully eliminated the systemic obstacles to obtaining community settings, while it continued to work toward even stronger results.  *See supra* pp. 37-38 (vacatur does not require perfection and systemwide relief cannot rest on isolated errors).

Plaintiffs (but not the monitor) also argued that the State was noncompliant with the decree's sixth requirement because it "spread the recommended [hourly rate] increases over a six-year period" instead of the five-year period recommended by Guidehouse.  Doc. 853 at 16-18.  But the decree did not require the State, and the State did not otherwise agree, to strictly implement Guidehouse's recommendations on a particular timeframe.  Instead, the State retained Guidehouse in response to the district court's August 2017 order, which did not (and recognized that the court could not) direct specific rate increases.  *Supra* pp. 19-21; *see also* Doc. 695 at 2 (court "does not have authority to order an increase in wages").  Nor were the recommended increases required by *Olmstead*, which does not require a certain level of services.  527 U.S. at 603 n.14.  To be sure, the State generally "supported"

Guidehouse's recommendations, but it also made clear that the recommended increases would need to be phased in over a slightly longer period because they required legislative approvals in the face of competing budgetary demands. Doc. 747 at 1-4. And subject to those constraints, the State has worked diligently to implement the Guidehouse recommendations, having substantially and steadily raised hourly rates before and after the motion to vacate. *Supra* pp. 16-18.

Next, the monitor and plaintiffs relied on the results of the monitor's survey, which considered the quality of services in a subset of community settings, *supra* pp. 21, and urged the court to adopt the monitor's proposed 85% "compliance" threshold. Doc. 853 at 28-30. But the topics covered by the monitor's survey are not, in and of themselves, required by the Constitution, any statutory obligations, or even the consent decree itself. Instead, the monitor's survey covered 17 domains and nearly 200 topics, *see* Doc. 807 at 7-32, many of which simply sought to assess compliance with best practices — such as whether the private facilities that were the subject of the survey had landscaping that is "well kept," were "odor free," had visible "mementos," and resolved all resident complaints in a "satisfactory" manner. *See id.* (survey results for 2022-23). Because "ensuring that the [State] implements best practices rather than eliminates an ongoing violation of federal law" is "antithetical to the limited role the Constitution created" for the Article III courts, the survey results cannot provide a basis for denying the motion to vacate. *See Shakman*, 43 F.4th at 732. Moreover, notwithstanding the survey's overbreadth, the monitor reported that the State's "overall" compliance rate with the survey topics increased

from 61% in 2019 to 79% in 2023.  Doc. 807 at 34-35.  Thus, to the extent the survey results were relevant to the district court's analysis, they support rather than undermine the State's substantial compliance with the decree.  *Supra* pp. 37-38 (vacatur does not require perfection).

Nor, contrary to the suggestion of the monitor and plaintiffs, did the fact that there were 195 class members residing in state facilities preclude a finding of substantial compliance.  *See* Doc. 853 at 21-23; Doc. 808 at 12-14.  To begin, although plaintiffs argued that decree sub-paragraphs 21(a) and (c) prohibited the State from placing class members in state facilities, this is incorrect:  these provisions merely state that accepting interim services will not exclude an individual from being deemed in a "crisis" situation, and identify interim placement in intermediate facilities as an example of interim services.  *See* Doc. 549 at 11-12.  In any event, although the State acknowledged that it uses state facilities as a "last resort" when class members request crisis services and no private facility can accommodate the emergency request, 195 individuals is less than 1% of the class, and 139 of those 195 were in state facilities because their "guardian [would] not agree to placement," Doc. 808 at 14.  And as explained, such areas for improvement do not reflect systemic issues or prevent a finding of substantial compliance.  *See supra* pp. 37-38.

Finally, plaintiffs and the monitor contested the State's compliance with the decree's fifth requirement — that the State transition individuals on the waiting list to community services and settings at a "reasonable pace" — even though:  plaintiffs conceded in August 2021 that the State was in substantial compliance with this

requirement, Doc. 853 at 11; and neither plaintiffs nor the monitor objected when the State told the district court in 2022 and 2023 that it continued to exceed the "reasonable pace" obligations, Doc. 771 at 3; Doc. 775 at 19; Doc. 819 at 22. Plaintiffs' argument rested on a new and mistaken interpretation of the fifth requirement. The decree does not define "reasonable pace," but in 2019, the parties agreed that it meant that by 2025, no eligible individuals seeking to transfer to the community would be on the waiting list "for over 60 months." Doc. 719 at 29-30. In other words, the parties agreed in 2019 that the State would select individuals from the waiting list within 60 months — something within its control. Plaintiffs, by contrast, argued in their 2024 response to the motion to vacate that the 60 months should be measured from when they began receiving services from private entities. Doc. 853 at 11. But that disregards the parties' prior agreement with respect to the meaning of the "reasonable pace" requirement, which the monitor had previously recognized meant "the maximum time on the [waiting] list would be 60 months from the date of enrollment." Doc. 766 at 14. And, as explained, the monitor did not include noncompliance with the "reasonable pace" requirement among the three issues she identified in August 2023 as grounds for keeping the decree open. *Supra* pp. 22-24.

The issues and arguments raised by the monitor and plaintiffs in response to the State's motion to vacate the consent decree thus do not provide support for the district court's unreasoned decision denying that motion.

**III. Alternatively, the district court should have vacated the decree because applying it prospectively is no longer equitable.**

Regardless of whether the State "satisfied" the decree, this court should reverse the denial of the motion to vacate because continued enforcement is "no longer equitable" and contravenes principles of federalism. Fed. R. Civ. P. 60(b)(5); *see Horne*, 557 U.S. at 454 (vacatur appropriate if continue enforcement is no longer equitable even absent satisfaction). Continued enforcement of a decree is no longer equitable if the decree is not supported by ongoing systemic violations of federal law. *Horne*, 557 U.S. at 451, 454; *Shakman*, 43 F.4th at 730 (focusing on "systemic" violations); *see also Milliken v. Bradley*, 433 U.S. 267, 282 (1977) (decrees "exceed appropriate limits if they are aimed at eliminating a condition that does not violate [federal law] or does not flow from such a violation"). This is true even if the State came into compliance with federal law through means other than those specified in the decree. *Horne*, 557 U.S. at 451, 454.

When determining whether it would no longer be equitable to continue to enforce a consent decree, courts should keep in mind that Rule 60(b)(5) serves a "particularly important function" in institutional reform litigation because consent decrees "raise sensitive federalism concerns." *Horne*, 557 U.S. at 447-48. States have limited funds, so when a decree causes money to be allocated for one program, "the effect is often to take funds away from other important programs." *Id.*; *see also Missouri v. Jenkins*, 515 U.S. 70, 131 (1995) (Thomas, J., concurring) (consent decrees "force[ ] state officials to reallocate state resources and funds . . . at the expense of other citizens, other government programs, and other institutions not

represented in court"). Nor should federalism concerns be set to one side because a decree was reached through agreement. States "depend on successor officials . . . to bring new insights and solutions to problems of allocating revenues and resources," and when state officers inherit "decrees that limit their ability to respond to the priorities and concerns of their constituents, they are constrained in their ability to fulfill their duties as democratically-elected officials." *Horne*, 557 U.S. at 449-50.

And federalism concerns are particularly present in cases like this one. Five justices in *Olmstead* acknowledged the significant federalism costs associated with the ADA's "integration" mandate. *See* 527 U.S. at 610 (Kennedy, J., joined by Breyer, J., concurring) (explaining that, given "federalism costs," courts should apply *Olmstead* "with great deference to the medical decisions of the responsible, treating physicians and, as the Court makes clear, with appropriate deference to the program funding decisions of state policymakers"); *id.* at 624 (Thomas, J., joined by Rehnquist, C.J., and Scalia, J., dissenting) (expressing "fear that the majority's approach imposes significant federalism costs" by "directing States how to make decisions about their delivery of public services").

Thus, regardless of whether the decree was "satisfied," the district court should have terminated it if continued enforcement was unnecessary to avoid ongoing systemic violations of federal law. *Supra* p. 48. Moreover, a "proper analysis" under *Horne* required the district court to "ascertain whether ongoing enforcement of the original [decree] was supported by an ongoing violation of federal law." 557 U.S. at 454. Where, as here, the State identified changed circumstances,

the court was required to conduct a "proper examination" of the changes, *id.* at 457, 459, including by making "up-to-date factual findings" regarding whether the changed circumstances warranted relief, *id.* at 469-70; *see also id.* at 468 (explaining that "proper Rule 60(b)(5) inquiry . . . should ask whether, as a result of structural and managerial improvements," State was complying with statute, and holding that district court made "insufficient factual findings" to find an ongoing violation of statute). The district court's unreasoned denial of the State's motion to vacate violated these requirements.

Here, plaintiffs sought redress for the State's alleged "practice of requiring [class members] to reside in [intermediate facilities] . . . as a condition of receiving" the benefits for which they were eligible. Doc. 436 at 1-2; *see also* Doc. 522-1 at 23-24 (claim alleged that the State lacked a plan for placing people with developmental disabilities in less restrictive settings). In *Olmstead*, the Supreme Court interpreted the ADA's anti-discrimination provision to require placement in community settings "when the State's treatment professionals have determined that community placement is appropriate, the transfer from institutional care to a less restrictive setting is not opposed by the affected individual, and the placement can be reasonably accommodated, taking into account the resources available to the State and the needs of others with mental disabilities." 527 U.S. at 587. But the Court did not hold that the ADA set a "standard of care" or require States to "provide a certain level of benefits to individuals with disabilities." *Id.* at 603 n.14.

50

Had the district court conducted the "proper analysis" required by *Horne*, it would have determined that there are no ongoing systemic violations of integration mandate, as interpreted by *Olmstead*. As the State's motion to vacate demonstrated, today, it is the State's policy and practice to inform individuals with developmental disabilities of their options; assess their eligibility for community services and settings; if eligible, offer them a choice between intermediate facilities, on the one hand, and community services and settings, on the other; and maintain a waiting list that moves individuals into community services and settings at a reasonable pace. *Supra* pp. 15-16. The State has invested the resources needed to support this system, resulting in more than 13,000 class members receiving the community-based services sought by this lawsuit. *Supra* pp. 16-18. And although areas for improvement remain, they are isolated and individualized, impacting less than 2% of class members. *Supra* pp. 43-47. Given these changed circumstances, continued enforcement of the decree is not supported by ongoing systemic violations of federal law and would be inequitable. *See Horne*, 557 U.S. at 451, 454; *see also Shakman*, 43 F.4th at 731.

Not only is continued enforcement of the decree no longer equitable, but the ongoing enforcement proceedings raise substantial federalism concerns, for at least three reasons. First, plaintiffs and the monitor sought to condition termination of the decree on the State obtaining an 85% compliance rate based on the results of the monitor's 225-person survey tool concerning the quality of services in community settings. *Supra* p. 45. But that survey evaluated many best practices rather than

constitutional or statutory requirements, asking, for example, whether the facilities at issue had landscaping that was "well kept," were "odor free," had visible "mementos." *Id.* Plaintiffs' opposition to terminating the decree thus was coupled with an impermissible request that the district court micromanage state operations. *See Shakman*, 43 F.3d at 731 (courts must avoid "becoming enmeshed in the minutiae of state operations and depriving local officials of their own legislative and executive responsibilities") (cleaned up).

Second, when responding to the State's motion to vacate, plaintiffs suggested they were entitled to relief that would require the district court to exercise control over the State's budgetary priorities. *See, e.g.*, Doc. 853 at 16-18 (arguing that State should have allocated an additional $435 million toward decree compliance between 2022 and 2024, and should have increased hourly rates to the full extent and exact timeframe recommended by Guidehouse); *id.* at 19 (arguing that State's funding increase from $752 million to $1.8 billion per year was not "remotely sufficient"). But governments have limited funds, so when a decree causes money to be allocated for one program, "the effect is often to take funds away from other important programs," implicating "sensitive federalism concerns." *Horne*, 557 U.S. at 448.

Finally, both plaintiffs and the monitor have sought relief that exceeded the scope of the decree. For instance, the newly appointed third monitor's 2025 report raised concerns about living conditions in state and intermediate facilities. *E.g.*, Doc. 933 at 10-12; *see also* Doc. 911 at 4. But plaintiffs filed this lawsuit, and the parties entered the consent decree, to eliminate barriers to transitioning eligible individuals

from private institutions to the community — not to address complaints about the institutions themselves. *Supra* pp. 9-12; *see generally* Docs. 436, 549. Indeed, state facilities were never part of the decree, *supra* pp. 11-12, and, as the parties understood at the time, the agency that regulates intermediate facilities is not a party to the decree. *See* Doc. 549 at ¶ 3(n) (noting that intermediate facilities are licensed by the Illinois Department of Public Health); *see also* 210 ILCS 47/3-202. These efforts to expand the scope of the decree to new areas not previously contemplated exceed the limited role of courts under Article III. *See Shakman*, 43 F.4th at 732 (courts lack "amorphous power to supervise the operations of government and reimagine [them] from the ground up").

For their part, plaintiffs argued in the district court that the State's motion to vacate did not include an argument that it would no longer be equitable to enforce the decree. Doc. 853 at 3-4. That was incorrect. The State's motion expressly invoked the first and third, but not the second, prong of Rule 60(b)(5), *see* Doc. 837 at 5 (stating that Rule 60(b)(5) authorizes relief from a decree based on satisfaction or if "applying it prospectively is no longer equitable"), and explained that under *Horne*, continued enforcement is improper if there "are no ongoing, systemic legal violations[,]" *id*. at 6 (citing *Horne*, 557 U.S. at 450). And, the State argued, the systemwide changes it had implemented not only demonstrated that it had "satisfied" the decree, but also showed that it had eliminated the systemic barriers that allegedly resulted in federal law violations, with the result that "equitable concerns that guide federal court oversight of institutional reform decrees" required

termination.  *Id.* at 8; *see also id.* at 33 (arguing that State implemented durable remedy to "minimize the risk of future systemic violations of federal law of the kind that prompted this case and decree"); *id.* at 34 (arguing that, under *Shakman*, equitable considerations warranted vacatur).

Thus, under *Horne*, the district court should not have denied the motion to vacate without identifying ongoing systemic violations of federal law, which given the changed circumstances established by the State, the court could not do.  The State brought this error to the court's attention in its September 2024 motion for reconsideration, including by requesting that the district court make the necessary findings of fact and provide its reasoning for denying the motion to vacate.  Doc. 861 at 3-7.  Instead of doing so, after a 10-month delay, the court entered another minute order that failed to make findings or explain its reasoning, and that held the State's motion was "moot" and "over taken by events," referring to the third monitor having filed a report and the parties having continued to work on a 2026 update to the implementation plan as required by the decree.  Doc. 895.  This was incorrect.  The decree was not terminated as the State had requested, and therefore not "moot," and the subsequent events simply continued the decree's monitoring process — the exact process from which the State had asked to be relieved.  *See Glob. Relief Found. Inc. v. O'Neill*, 315 F.3d 748, 751 (7th Cir. 2002) ("When relief is possible, a lawsuit is not moot.").

For these reasons, even if this court does not conclude that the State "satisfied" the 2011 consent decree, the court should reverse the district court's

unreasoned decision denying the State's motion to vacate because continued

enforcement of the decree is unnecessary to remedy systemic violations of federal law

and thus no longer equitable, and also contravenes principles of federalism.

## CONCLUSION

Defendants-Appellants Dulce Quintero and Elizabeth M. Whitehorn ask this court to reverse the district court's order denying the State's motion to vacate the 2011 consent decree.

Respectfully submitted,

**KWAME RAOUL**
Attorney General
State of Illinois

**JANE ELINOR NOTZ**
Solicitor General

115 South LaSalle Street
Chicago, Illinois 60601
(312) 814-3000

Attorneys for Defendants-Appellants

/s/ Jonathon M. Studer
**JONATHON M. STUDER**
Assistant Attorney General
115 South LaSalle Street
Chicago, Illinois 60603
(312) 814-0937 (office)
(312) 415-8065 (cell)
Jonathon.Studer@ilag.gov

April 8, 2026

**CERTIFICATE OF COMPLIANCE WITH WORD LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS**

I hereby certify that this brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and Circuit Rule 32 and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in proportionally spaced typeface using Microsoft® Word for Microsoft 365, in 12-point Century Schoolbook BT font, and complies with Circuit Rule 32(c) in that the brief is 13,915 words.

/s/ Jonathon M. Studer
JONATHON M. STUDER
Assistant Attorney General
115 South LaSalle Street
Chicago, Illinois 60603
(312) 814-0937 (office)
(312) 415-8065 (cell)
Jonathon.Studer@ilag.gov

# CERTIFICATE OF RULE 30 COMPLIANCE

In accordance with this Court's Rule 30(d), I certify that all materials required

by this Court's Rules 30(a) and (b) are included in the short appendix to the brief.

/s/ Jonathon M. Studer
JONATHON M. STUDER
Assistant Attorney General
115 South LaSalle Street
Chicago, Illinois 60603
(312) 814-0937 (office)
(312) 415-8065 (cell)
Jonathon.Studer@ilag.gov

# SHORT APPENDIX

**TABLE OF CONTENTS**

Minute Order dated Aug. 30, 2024 (Doc. 858) ........................................................... SA1

Minute Order dated Aug. 1, 2025 (Doc. 895) ........................................................... SA3

Consent Decree (Doc. 549) (signature pages omitted)............................................... SA4

**UNITED STATES DISTRICT COURT**
**FOR THE Northern District of Illinois – CM/ECF NextGen 1.7.1.1**
**Eastern Division**

Stanley Ligas, et al.

                Plaintiff,

v.

                                           Case No.: 1:05–cv–04331
                                           Honorable Sharon Johnson Coleman

Grace Hou, et al.

                Defendant.

**NOTIFICATION OF DOCKET ENTRY**

This docket entry was made by the Clerk on Friday, August 30, 2024:

      MINUTE entry before the Honorable Sharon Johnson Coleman: Defendant's motion to vacate the consent decree [831] is denied without prejudice. The Court acknowledges that there has been significant progress since the beginning of this consent decree. However, based on the arguments presented during the hearing and the parties' briefs, the Court finds that Defendant has not met its burden to show that the consent decree should be terminated. With that said, the Court recognizes that certain legal issues will need to be addressed and resolved in order to one day get to a point where a consent decree is no longer necessary. Further, the Court also reminds the parties that a consent decree "is essentially a contract for purposes of construction." McGee v. Illinois Dep't of Transp., No. 02 C 0277, 2002 WL 31478261 at *5 (N.D. Ill. Nov. 5, 2002). To that end, it is now ordered that the parties submit additional briefing on the following issues for resolution: (1) whether interim placement of class members in crisis in Special Operational Developmental Centers ("SODCs") constitutes a violation of the consent decree's express terms; and (2) what the decree's requirement is for "expeditiously" placing class members in community–based services. It is the Court's hope that resolution of these issues will bring the parties closer to termination of the consent decree. To respond to the Court's concern, the Court requests the Court Monitor to provide any additional information to the Court and all parties by 9/24/2024. Each party must then submit their briefs by 10/24/2024. Additionally, Plaintiff's proposed plan for discovery [838] addressing Defendant's motion to vacate the consent decree is stricken as moot. Mailed notice. (ym)

**ATTENTION:** This notice is being sent pursuant to Rule 77(d) of the Federal Rules of Civil Procedure or Rule 49(c) of the Federal Rules of Criminal Procedure. It was generated by CM/ECF, the automated docketing system used to maintain the civil and criminal dockets of this District. If a minute order or other document is enclosed, please refer to it for additional information.

SA1

For scheduled events, motion practices, recent opinions and other information, visit our web site at ***www.ilnd.uscourts.gov***.

SA2

**UNITED STATES DISTRICT COURT**
**FOR THE Northern District of Illinois – CM/ECF NextGen 1.8 (rev. 1.8.3)**
**Eastern Division**

Stanley Ligas, et al.

                    Plaintiff,

v.                                              Case No.: 1:05–cv–04331
                                                Honorable Sharon Johnson Coleman

Grace Hou, et al.

                    Defendant.

**NOTIFICATION OF DOCKET ENTRY**

This docket entry was made by the Clerk on Friday, August 1, 2025:

        MINUTE entry before the Honorable Sharon Johnson Coleman: In its 3/13/2025 order recognizing the appointment of the new Court Monitor, the Court directed the Court Monitor "to submit a report advising the Court on what constitutes substantial compliance under the consent decree as informed by the parties' briefings on Defendants' motion for reconsideration" and to suggest "potential metrics for measuring substantial compliance moving forward to inform resolution of the consent decree" [887]. As a result of the Court Monitor's 6/10/2025 report [893] and the parties' ongoing efforts to develop an agreed SFY 2026 Implementation Plan based on the report's findings, conclusions, and proposed next steps [894], the Court considers Defendants' motion for reconsideration to have been over taken by events. Accordingly, Defendants' motion is stricken as moot [861]. All deadlines set in the Court's order entered on 6/11/2025 remain as scheduled. Mailed notice. (ym)

**ATTENTION:** This notice is being sent pursuant to Rule 77(d) of the Federal Rules of Civil Procedure or Rule 49(c) of the Federal Rules of Criminal Procedure. It was generated by CM/ECF, the automated docketing system used to maintain the civil and criminal dockets of this District. If a minute order or other document is enclosed, please refer to it for additional information.

For scheduled events, motion practices, recent opinions and other information, visit our web site at *www.ilnd.uscourts.gov*.

SA3

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| STANLEY LIGAS, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | No. 05 C 4331 |
| | ) | |
| vs. | ) | Chief Judge Holderman |
| | ) | Magistrate Judge Cole |
| JULIE HAMOS, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**CONSENT DECREE**

SA4

## TABLE OF CONTENTS

INTRODUCTION AND BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

DECREE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

I.      JURISDICTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II.     CLASS DEFINITION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

III.    DEFINITION OF TERMS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

IV.     THE DEVELOPMENTAL DISABILITY SERVICES SYSTEM . . . . . . . . . . . . . . . . . 7

V.      DETERMINATION OF CLASS MEMBERSHIP . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

VI.     STATEWIDE DATABASE AND WAITING LIST . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

VII.    TRANSITION SERVICE PLANS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

VIII.   BENCHMARKS FOR TRANSITIONS OF CLASS MEMBERS RESIDING IN
        ICFs-DD AS OF THE DATE OF APPROVAL OF THE DECREE . . . . . . . . . . . . . . 10

IX.     BENCHMARKS FOR TRANSITIONS OF CLASS MEMBERS NOT RESIDING
        IN ICFs-DD AS OF THE DATE OF APPROVAL OF THE DECREE . . . . . . . . . . . . 11

X.      PROVISION OF SERVICES AFTER THE END OF THE SIXTH YEAR
        FOLLOWING APPROVAL OF THE DECREE . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

XI.     DISPUTE RESOLUTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

XII.    OUTREACH . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

XIII.   IMPLEMENTATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

XIV.    MONITORING AND COMPLIANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

XV.     NAMED PLAINTIFFS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

XVI.    ATTORNEYS' FEES AND COSTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

XVII.   MISCELLANEOUS PROVISIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

XVIII.  TERMINATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

SA5

**INTRODUCTION AND BACKGROUND**

Plaintiffs[1], who are Illinois residents with Developmental Disabilities, filed this class action lawsuit on July 28, 2005, seeking declaratory and injunctive relief to redress violations of the community integration mandates of Title II of the Americans with Disabilities Act, 42 U.S.C. § 12132; Section 504 of the Rehabilitation Act, 29 U.S.C. § 794(a); and Title XIX of the Social Security Act, 42 U.S.C. §§ 1396-1396v. Plaintiffs allege that those federal statutes require Defendants to: (a) provide services, programs and activities in the most integrated setting appropriate to the needs of Individuals with Developmental Disabilities; (b) implement procedures to provide such services, programs and activities; and (c) offer Individuals with Developmental Disabilities a choice between services, supports and programs provided in ICFs-DD, and services, supports and programs that are integrated into the community. Defendants have denied liability. Intervenors are Illinois residents with Developmental Disabilities who have intervened to ensure that the State of Illinois continues to meet its obligations to also provide ICF-DD services.

In the interest of compromise and settlement, Plaintiffs, Intervenors, and Defendants have entered into a Stipulation agreeing to the form, and jointly moved for preliminary and final approval, of a proposed consent decree. On January 13, 2011, the Court entered an Order preliminarily approving the Decree set forth below in accordance with Parties' proposal. (Doc. No. 525.) Thereafter, pursuant to that Order, the Parties provided notice in accordance therewith, which the Court previously found, and hereby affirms, constitutes reasonable notice under the circumstances, and is in full compliance with the requirements of due process and governing law.

On June 15, 2011, the Court conducted a fairness hearing, at which it considered the written submissions of all interested persons and the presentations made in open court; and assessed the fairness and reasonableness of the Decree set forth below, taking into account the

---

[1] Certain capitalized terms set forth herein are defined in Section III, below.

1

SA6

benefits of litigation to the Plaintiffs as compared with the benefits offered by the Decree, the resources of the State of Illinois, and the needs of the Intervenors and other Individuals with Developmental Disabilities. As set forth in its Order dated June 15, 2011 (Doc. No. 547), the Court is of the opinion that the Decree set forth below represents a fair resolution of the competing interests of Plaintiffs, Intervenors, and Defendants; that it is fair, reasonable and adequate; and that it should be and is approved pursuant to Rule 23 of the Federal Rules of Civil Procedure.

Therefore, upon all of the foregoing, and the Court being otherwise fully advised, the Court hereby ORDERS, ADJUDGES and DECREES as follows:

**DECREE**

## I. JURISDICTION

1. The Court has jurisdiction over this Litigation pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343.

## II. CLASS DEFINITION

2. The Class is defined as those individuals in one of two sub-classes:

    (a) adult individuals in Illinois:

        (i) who have mental retardation and/or other developmental disabilities within the meaning of the ADA, 42 U.S.C. § 12131(2) and the Rehabilitation Act, 29 U.S.C. § 794(a), and who qualify for Medicaid Waiver services;

        (ii) who reside in private ICFs-DD with nine or more residents; and

        (iii) for whom Defendants (including Defendants' agencies, employees, contractors and agents, and those acting in concert with them) have a Current Record reflecting that the individual has affirmatively requested to receive Community-Based Services or placement in a Community-Based Setting; or

    (b) adult individuals in Illinois:

        (i) who have mental retardation and/or other developmental disabilities within the meaning of the ADA, 42 U.S.C. § 12131(2)

2

SA7

and the Rehabilitation Act, 29 U.S.C. § 794(a), and who qualify
for Medicaid Waiver services;

(ii) who reside in a Family Home and are in need of Community-Based Services or placement in a Community-Based Setting; and

(iii) for whom Defendants (including Defendants' agencies, employees, contractors and agents, and those acting in concert with them) have a Current Record reflecting that the individual has affirmatively requested to receive Community-Based Services or placement in a Community-Based Setting.

## III. DEFINITION OF TERMS

3. As used herein, the following terms have the following meanings:

(a) "Approval of the Decree" means the date defined in Paragraph 40, below.

(b) "Class Counsel" means all of the attorneys that have appearances on behalf of the Named Plaintiffs in effect as of the Approval of the Decree, and each of the following organizations: Equip for Equality; SNR Denton; Access Living of Metropolitan Chicago; and Roger Baldwin Foundation of ACLU, Inc.

(c) "Class" and "Class Members" mean the persons who meet the definition set forth in Section II, above.

(d) "Community-Based Services" means those services (other than a placement in a Community-Based Setting) available under the Waiver.

(e) "Community-Based Setting" means a Waiver-funded residential setting with a maximum of eight (8) beds, but does not include an ICF-DD, that is the most integrated residential setting appropriate for an Individual where the setting is designed to promote independence in daily living, community integration, and economic self-sufficiency and enables the Individual to interact with non-disabled persons to the fullest extent possible.

3

SA8

(f)     "Community Service Provider" means a provider of Waiver-funded services, but does not include an ICF-DD or a State Operated Developmental Center.

(g)     "Court" means the United States District Court for the Northern District of Illinois, Eastern Division.

(h)     "Crisis" has the meaning set forth in Paragraph 21(a), below.

(i)     "Current Record" means an accurate record reflecting that the Individual, or the Individual's legal guardian, has affirmatively requested to receive Community-Based Services or placement in a Community-Based Setting, and, to the best of Defendants' knowledge, that record has not been withdrawn or retracted by the Individual or the Individual's legal guardian.  All Individuals who objected (either personally, or through the Individual's legal guardian) to the Proposed Consent Decree that was the subject of the July 1, 2009 Fairness Hearing in this Litigation, on the grounds that they do not wish to receive Community-Based Services or placement in a Community-Based Setting shall be deemed to have retracted any record reflecting that, prior to such objection, he or she had affirmatively indicated that he or she seeks to receive Community-Based Services or placement in a Community-Based Setting.

(j)     "Decree" means this Consent Decree.

(k)     "Defendants" means the Director of the Illinois Department of Healthcare and Family Services; the Secretary of the Illinois Department of Human Services; and any of their successors.

(l)     "Developmental Disability" means a disability that is attributable to a diagnosis of mental retardation (mild, moderate, severe, profound), or a related condition.  A related condition is attributable to: cerebral palsy or epilepsy, or any other condition, other than mental illness, found to be closely related to mental retardation because this condition results in impairment of general intellectual functioning or adaptive behavior similar

4

SA9

to that of persons with mental retardation, and requires treatment or services similar to those required for persons with mental retardation. In addition, this condition is manifested before the age of 22; is likely to continue indefinitely; and results in substantial functional limitations in three or more of the following areas of major life activity: self-care; understanding and use of language; learning; mobility; self-direction; capacity for independent living.

(m)    "Family Home" means a family home and does not include a Community-Integrated Living Arrangement, as defined at 210 ILCS §135/3(d), or an ICF-DD.

(n)    "ICF-DD" means any privately-owned long term care facility licensed by the Illinois Department of Public Health as an Intermediate Care Facility for the Developmentally Disabled, as defined at 77 Ill.Adm.Code §300.330.

(o)    "ICF/MR services" shall have the meaning set forth in 42 C.F.R. § 440.150.

(p)    "Implementation Plan" has the meaning set forth in Section XIII, below.

(q)    "Individual" means a person in Illinois 18 years of age or older who has one or more Developmental Disabilities and who is Medicaid-eligible.

(r)    "Intervenors" mean those individuals granted leave to intervene pursuant to the Court's Memorandum Opinion and Order entered on April 7, 2010. (Doc. No. 479)

(s)    "Intervenors' Counsel" means all of the attorneys who have appearances on behalf of the Intervenors in effect as of the Approval of the Decree.

(t)    "Litigation" means the matter *Ligas v. Hamos*, Case No. 05-4331, filed in the United States District Court for the Northern District of Illinois, Eastern Division.

(u)    "Monitor" means the person or entity appointed by the Court pursuant to Section XIV, below, to perform the functions more fully described therein.

5

SA10

(v) "Named Plaintiffs" means the following people, each of whom the Court certified as a class representative in the Litigation: David Cicarelli, Isaiah Fair, Stanley Ligas, Jamie McElroy, and Jennifer Wilson.

(w) "Parties" means Plaintiffs and Defendants, collectively.

(x) "Plaintiffs" means the Named Plaintiffs and Class Members, collectively.

(y) "Protective Order" means the Protective Order entered by the Court in the Litigation on May 15, 2006 (Doc. No. 98).

(z) "Qualified Professional" means an appropriately trained and qualified professional.

(aa) "State Plan" means the plan that was submitted by the State of Illinois to the United States Department of Health and Human Services, Centers for Medicare and Medicaid Services, in accordance with Title XIX of the Social Security Act, 42 U.S.C. §§ 1396-1396v, in effect as of the date of Approval of the Decree, including any amendments thereto.

(bb) "Transition Service Plan" has the meaning set forth in Section VII, below.

(cc) "Waiting List" has the meaning set forth in Paragraph 9, below.

(dd) "Waiting List Class Members" has the meaning set forth in Paragraph 22(c), below.

(ee) "Waiver" means the Illinois Home and Community-Based Services Waiver for Adults with Developmental Disabilities, as approved by the United States Department of Health and Human Services, Centers for Medicare and Medicaid Services, in effect as of the date of Approval of the Decree, or any amendments thereto or similar waivers subsequently approved by the United States Department of Health and Human Services, Centers for Medicare and Medicaid Services, but only to the extent such amendments or subsequent waivers expand the range and/or amount of services available to Individuals with Developmental Disabilities.

6

SA11

**IV.     THE DEVELOPMENTAL DISABILITY SERVICES SYSTEM**

4.     **Development of Resource Capacity**.  The choices of Individuals with Developmental Disabilities, including Class Members, to receive Community-Based Services or placement in a Community-Based Setting or to receive ICF/MR services in an ICF-DD will be honored; provided, however, that this commitment to honoring choice does not alter Defendants' current obligations under existing law regarding licensed ICF-DD capacity system-wide or at any specific ICF-DD, and provided that, under current applicable law, this commitment does not entitle an Individual with Developmental Disabilities to receive ICF/MR services in a specific ICF-DD.  Defendants shall implement sufficient measures to ensure the availability of services, supports and other resources of sufficient quality, scope and variety to meet their obligations to such Individuals under the Decree and the Implementation Plan consistent with such choices. While the Decree remains in effect, any amendment to the State Plan submitted by the State pursuant to 42 U.S.C. § 1396, *et seq.* will continue to include ICF-DD services as an alternative choice for long-term care services for eligible Individuals with Developmental Disabilities. Nothing in this Decree shall impair Defendants' ability to make changes in their provision of supports and services to Individuals with Developmental Disabilities, including Class Members, regardless of setting, provided that Defendants continue to honor Individuals' choices and fulfill Defendants' obligations under the Decree and Implementation Plan.  Resources necessary to meet the needs of Individuals with Developmental Disabilities who choose to receive services in ICFs-DD shall be made available and such resources will not be affected by Defendants' fulfillment of their obligations under the Decree, including the obligations under Paragraphs 17 through 19 and 21 through 23.  Funding for services for each Individual with Developmental Disabilities will be based on the Individual's needs using federally approved objective criteria regardless of whether the Individual chooses to receive services in an ICF-DD or in a Community-Based Setting; provided, however, nothing in this Decree shall require Defendants to change their current method for establishing funding or from adopting new methods based upon federally approved objective criteria.

5.     **Resources and Budget Requests**.  Annual budgets submitted by Defendants on behalf of their agencies shall request sufficient funds necessary to develop and maintain the

7

services, supports and structures described in the Decree, consistent with the choices of Individuals with Developmental Disabilities, including Class Members. Defendants shall take steps sufficient to implement funding mechanisms that facilitate transition among service settings. Nothing contained in this Paragraph 5 shall be deemed to create or operate as (i) a condition or contingency upon which any term of the Decree depends; or (ii) a circumstance entitling Defendants to alter, amend or modify the implementation or timing of Defendants' obligations under the Decree.

## V.   DETERMINATION OF CLASS MEMBERSHIP

6.   Within thirty (30) days after Approval of the Decree, Defendants shall compile an initial list of Class Members by taking the list of Individuals to whom notice of Preliminary Approval of this Decree was sent, adding those Individuals from whom any of the Parties received a written, affirmative request to receive Community-Based Services or placement in a Community-Based Setting after notice of Preliminary Approval of this Decree was sent, but excluding (i) those individuals who filed objections to the Proposed Consent Decree that was the subject of the July 1, 2009 Fairness Hearing as described in Paragraph 3(i) above, and (ii) those Individuals from whom Defendants receive written requests that the Individuals do not wish to receive Community-Based Services or placement in a Community-Based Setting.

7.   Within thirty (30) days after compiling the initial list described in Paragraph 6 above, Defendants shall confirm whether all Class Members on the initial list are included in the statewide database described in Paragraph 8 below and shall add – to the extent possible with available information – those Class Members not already included.

## VI.   STATEWIDE DATABASE AND WAITING LIST

8.   Defendants shall maintain a statewide database in which all Class Members are enrolled. Defendants must promptly and regularly add Individuals to this database as they become Class Members. If Defendants receive written requests from Individuals that the Individuals would not wish to receive Community-Based Services or placement in a Community-Based Setting, Defendants shall promptly revise the database to reflect the fact that such Individuals are no longer Class Members. Defendants must update all enrollment information on an annual basis.

8

SA13

9.      Class Members not residing in ICFs-DD as of the date of Approval of the Decree who are enrolled in the statewide database described in Paragraph 8 above shall be placed on a Waiting List with selection prioritized by the Class Member's urgency of need for Community-Based Services or placement in a Community-Based Setting, the length of time that has passed since the Class Member enrolled, geographical considerations and other factors.  Defendants must promptly and regularly update the Waiting List as Class Members are added to the database described in paragraph 8, above.

## VII.    TRANSITION SERVICE PLANS

10.      Within no more than twelve months prior to the development of a Transition Service Plan, Defendants shall present to the Class Member, in an objective manner, all of his or her service alternatives under the State Plan and any applicable Waiver, determine whether, after such presentation, the Class Member requests Community-Based Services or placement in a Community-Based Setting and obtain from the Class Member a completed and executed DDPAS-10 Form and a DMHDD-1238 Form (the "Request Forms") evidencing Class Member's request.  Upon receipt of the Request Forms from the Class Member, Defendants shall develop a Transition Service Plan specific to, and centered on, each Class Member as each Class Member is selected from the statewide database to receive Community-Based Services or placement in Community-Based Settings under this Decree.

11.      The Transition Service Plan shall describe the services the Class Member requires in a Community-Based Setting or through Community-Based Services; where and how such services can be developed and obtained; the supports and services the Class Member will need during his or her transition to a Community-Based Setting; and a timetable for completing that transition.

12.      The Transition Service Plan shall be developed by a Qualified Professional in conjunction with the Class Member and, where one has been appointed, the Class Member's legal guardian, and, where appropriate, the Class Member's family members, friends and support staff who are familiar with the Class Member.

13.      The process for developing a Transition Service Plan shall focus on the Class Member's personal vision, preferences, strengths and needs in home, community and work

SA14

environments and shall reflect the value of supporting the Class Member with relationships, productive work, participation in community life, and personal decision-making.

14.    All services and supports in the Transition Service Plan must be integrated into the community to the maximum extent possible, consistent with the choices of the Class Member and the Class Member's legal guardian.

15.    The Transition Service Plan shall not be limited by the current availability of services, provided, however, that nothing in this paragraph obligates Defendants to provide the types of services beyond those included in the Waiver and/or the State Plan.

16.    The Transition Service Plan shall be completed within sufficient time to provide appropriate and sufficient transitions of Class Members in accordance with the deadlines set forth in the Decree.

## VIII.    BENCHMARKS FOR TRANSITIONS OF CLASS MEMBERS RESIDING IN ICFs-DD AS OF THE DATE OF APPROVAL OF THE DECREE

17.    Subject to the interim requirements set forth below, within six (6) years after Approval of the Decree, all Class Members residing in ICFs-DD as of the date of Approval of the Decree (regardless of when in this timeframe the Class Member affirmatively requested placement in a Community-Based Setting) will transition to Community-Based Settings consistent with their Transition Service Plans, if, at the time of transition, the Class Member requests placement in a Community-Based Setting, as confirmed and documented in accordance with Paragraph 10.

18.    Within two and a half years after Approval of the Decree:  not less than one-third of the total number of those Class Members residing in ICFs-DD as of the date of Approval of the Decree who have, within two (2) years after the date of Approval of the Decree, affirmatively requested placement in a Community-Based Setting will be transitioned to Community-Based Settings consistent with their Transition Service Plans.

19.    Within four and a half years after Approval of the Decree:  not less than two-thirds of the total number of those Class Members residing in ICFs-DD as of the date of Approval of the Decree who have, within four (4) years after the date of Approval of the Decree, affirmatively requested placement in a Community-Based Setting will be transitioned to Community-Based Settings consistent with their Transition Service Plans.

10

SA15

**IX.  BENCHMARKS FOR TRANSITIONS OF CLASS MEMBERS NOT RESIDING IN ICFs-DD AS OF THE DATE OF APPROVAL OF THE DECREE**

20.  Within one (1) year after Approval of the Decree, Defendants shall screen all Class Members residing in a Family Home who are enrolled in the database described in Paragraph 8 as of the date of Approval of the Decree regarding the Class Members' potential eligibility and need for developmental disabilities services, including (i) a determination of whether such Class Members meet the Crisis criteria set forth in Paragraph 21(a) and, (ii) after presenting to the Class Member, in an objective manner, all of his or her service alternatives under the State Plan and any applicable Waiver, a determination of whether the Class Member requests Community-Based Services or placement in a Community-Based Setting, as confirmed and documented in accordance with Paragraph 10.

21.  **Class Members Who Reside in a Family Home and Are Determined to be in a Situation of Crisis.**

(a)  For purposes of the Decree, an Individual is in a situation of "Crisis" if he or she is at imminent risk of abuse, neglect, or homelessness.  The provision of interim emergency services (including interim placement in an ICF-DD where no placement in a Community-Based Setting was immediately available) will not necessarily exclude the Individual from being deemed to be in a situation of Crisis.  Some examples of circumstances that constitute Crisis include, but are not limited to circumstances:

(i)  where the Individual's caregiver(s) are deceased;

(ii)  where the Individual's caregiver is unable to address the support needs of the Individual, thereby jeopardizing the Individual's health, well-being, and/or safety;

(iii)  where physical and/or mental injury and/or sexual abuse is being inflicted on the Individual;

(iv)  where the Individual is homeless or without domicile; or

11

SA16

(v) where the Individual's behaviors (e.g., verbal and /or physical aggression, bodily harm to self and/or others) put the Individual and/or family member(s) at risk of serious harm.

(b) If, following a screening, the Individual who is determined to be in Crisis requests appropriate Community-Based Services to be provided in the Family Home or requests placement in a Community-Based Setting, Defendants will promptly develop, in conjunction with the Class Member, a Transition Service Plan. Transition Service Plans for such Class Members shall be developed as set forth in Section VII, above.

(c) Defendants shall ensure that all Class Members who are determined to be in a situation of Crisis, and who request to receive Community-Based Services and/or placement in a Community-Based Setting, receive such services and/or placement in such setting expeditiously. If a Class Member is determined to be in Crisis and then moves into an ICF-DD before Defendants are able to provide a placement in a Community-Based Setting, that change in the Class Member's residential status will not in itself change the determination of Crisis or change the Defendants' obligation to place the Class Member in a Community-Based Setting expeditiously, provided that, at the time of transition to a Community-Based Setting, the Class Member requests placement in a Community-Based Setting, as confirmed and documented at that time. There is no limit to, or cap upon, the number of Class Members in Crisis who shall be served pursuant to the Decree.

22. **Benchmarks for Transitions of "Waiting List Class Members"**

(a) Class Members who become residents of ICFs-DD after the date of Approval of the Decree, but who did not reside in ICFs-DD as of the date of Approval of the Decree, shall be enrolled in the database described in Paragraph 8, placed on the Waiting List described in Paragraph 9 and served in accordance with this Paragraph 22, provided that the Class

12

SA17

Member requests Community-Based Services or placement in a Community-Based Setting, as confirmed and documented in accordance with Paragraph 10.

(b) Class Members residing at a Family Home who, as a result of the screening described in Paragraphs 20 and 21(a), are not determined to be in a situation of Crisis but who have requested and been identified as appropriate for Community-Based Services or placement in a Community-Based Setting will be placed on the Waiting List described in Paragraph 9 and served in accordance with this Paragraph 22.

(c) Collectively, the Class Members identified in sub-Paragraphs 22(a) and 22(b), above, shall be referred to as "Waiting List Class Members."

(d) Within two (2) years after Approval of the Decree, Defendants shall provide, in accordance with the Class Members' Transition Service Plans, appropriate Community-Based Services and/or placement in Community-Based Settings for at least 1,000 Waiting List Class Members who are selected from the Waiting List described in Paragraph 9 above, with these Class Members served in order of priority. In each of the third, fourth, fifth and sixth years following Approval of the Decree, Defendants shall serve at least 500 additional Waiting List Class Members who are selected from the Waiting List, again in order of priority. The obligations set forth in this Paragraph 22(d) do not obligate Defendants to serve more than 500 additional Waiting List Class Members who are selected from the Waiting List in each of the third, fourth, fifth, and sixth years following Approval of the Decree.

## X. PROVISION OF SERVICES AFTER THE END OF THE SIXTH YEAR FOLLOWING APPROVAL OF THE DECREE

23. All Class Members who are on the Waiting List after the end of the sixth year following Approval of the Decree shall receive appropriate Community-Based Services and/or placement in a Community-Based Setting, such that they move off the Waiting List at a reasonable pace, provided that the Class Members have requested such services and/or settings at

13

SA18

the point when they are to move off the Waiting List and that the requests are confirmed and documented in accordance with Paragraph 10.

## XI.   DISPUTE RESOLUTION

24.     Any Class Member who disputes a decision by Defendants or a Community Service Provider regarding eligibility for, or delivery of, Community-Based Services or placement in a Community-Based Setting shall, pursuant to governing law, have the right to appeal or seek administrative or judicial review of such decisions through Defendants' existing Fair Hearings process (as set forth in 89 Ill.Adm.Code Part 120) or as otherwise provided by law.  Class Members also may avail themselves of any informal appeal process that currently exists.

## XII.   OUTREACH

25.     Defendants shall maintain a fair and accessible process by which Individuals with Developmental Disabilities or their legal guardians can affirmatively request in writing to receive Community-Based Services and/or placement in a Community-Based Setting or to receive ICF-MR services in an ICF-DD, and Defendants shall maintain up-to-date records of those requests.  Defendants, in conjunction with Class Counsel, also shall ensure that Individuals with Developmental Disabilities, and their guardians and/or families, have the opportunity to receive complete, accurate, and objective information regarding all alternative choices for long-term care services for eligible Individuals with Developmental Disabilities.  Nothing in this Paragraph, or any other provision of this Decree, requires Defendants to provide this information to Individuals or their guardians or families who are not interested in changing their current placement.  All costs for outreach shall be borne by Defendants.  Details about how Defendants shall conduct the obligations set forth in this Paragraph 25 will be set forth in the Implementation Plan described below.

## XIII.  IMPLEMENTATION

26.     **Overview and Contents of the Implementation Plan**.  Defendants, with the input of the Monitor, Plaintiffs, Class Counsel, Intervenors and Intervenors' Counsel shall create and implement an Implementation Plan to accomplish the obligations and objectives set forth in the Decree.  Intervenors and Intervenors' Counsel's input shall be limited to those portions of the

SA19

Implementation Plan which relate to Paragraphs 4-10, 25 and 45 of this Decree regarding Individuals who choose to receive ICF/MR services in an ICF-DD. The Implementation Plan must, at a minimum:

> (a) establish specific tasks, timetables, goals, programs, plans, strategies and protocols to assure that Defendants fulfill the requirements of each provision of the Decree;
>
> (b) describe the hiring, training and supervision of the personnel necessary to implement the Decree;
>
> (c) describe necessary resource development activities, including actions, inter-agency agreements, requests for proposals and the development of other resources necessary to implement the Decree;
>
> (d) describe the methods and mechanisms by which Defendants shall comply with the obligations set forth in Paragraph 25, above;
>
> (e) identify, based on information known at the time the Implementation Plan is prepared, any services or supports required in Transition Service Plans formulated pursuant to the Decree that are not currently available in the appropriate quantity, quality or geographic location; and
>
> (f) identify, based on information known at the time the Implementation Plan is prepared, any services and supports which, based on demographic or other data, are expected to be required in the following six months to meet the obligations of the Decree.

27. Within ninety (90) days after Approval of the Decree, Defendants shall provide the Monitor, Plaintiffs, Class Counsel, Intervenors and Intervenors' Counsel with a draft Implementation Plan. The Monitor, Plaintiffs and Class Counsel will participate in developing and finalizing the Implementation Plan, which shall be finalized and filed with the Court within six (6) months following Approval of the Decree. Intervenors may provide input to the Parties and the Monitor on the Implementation Plan. In the event the Monitor or Plaintiffs disagree with the Defendants' proposed Implementation Plan, the matter shall be submitted to the Court for resolution. If Intervenors disagree with the Defendants' proposed Implementation Plan with

15

SA20

respect to provisions in Paragraphs 4-10, 25 and 45 regarding Individuals who choose to receive ICF/MR services in an ICF-DD, Intervenors may submit any such issue to the Court for resolution. The Monitor, Plaintiffs, or Intervenors shall submit such issues within fourteen (14) days after the filing of the Implementation Plan.

28. The Implementation Plan shall be updated and amended annually, or at such earlier intervals as Defendants deem necessary or appropriate. The Monitor, Plaintiffs, Class Counsel, Intervenors and Intervenors' Counsel may review and comment upon any such updates or amendments. Intervenors' and Intervenors' Counsel's comments shall be limited to those updates or amendments which relate to provisions in Paragraphs 4-10, 25 and 45 of this Decree regarding Individuals who choose to receive ICF/MR services in an ICF-DD. In the event the Monitor or Plaintiffs disagree with the Defendants' proposed updates or amendments, the matter may be submitted to the Court for resolution. If Intervenors disagree with the Defendants' proposed updates or amendments relating to provisions in Paragraphs 4-10, 25 and 45 of this Decree regarding Individuals who choose to receive ICF/MR services in an ICF-DD, Intervenors may submit such issue to the Court for resolution.

29. The Implementation Plan, and any amendments or updates thereto, shall be set forth in a separate Court Order supplemental to the Decree.

## XIV. MONITORING AND COMPLIANCE

30. **Appointment of a Monitor**. The Court shall appoint an independent and impartial Monitor who is knowledgeable concerning the management and oversight of programs serving Individuals with Developmental Disabilities. The Parties shall endeavor to agree on a single candidate for Monitor, after obtaining input from Class Members. Intervenors may provide input to the Parties on the Monitor. Within twenty-one (21) days after Approval of the Decree, the Parties shall submit to the Court their joint recommendation or separate nominations for a Monitor. If the Parties cannot agree, Plaintiffs and Defendants shall each submit to the Court the names of no more than two qualified professionals or organizations who are experienced in the design and development of community programs for Individuals with Developmental Disabilities, and experienced in the administration and monitoring of specialized services for Individuals with Developmental Disabilities. Each Party will have seven (7) days to

16

SA21

comment on the qualifications of the other Party's candidate(s). Intervenors may, within the same seven (7) days, comment on the qualifications of any one or more of the Parties' candidates. The Court then shall select the Monitor from the names submitted by the Parties. In the event the Monitor resigns or otherwise becomes unavailable, and the Parties cannot agree on a replacement Monitor to recommend to the Court, the process described above will be used to select a replacement Monitor.

31.     **Role of the Monitor**. The duties of the Monitor shall include gauging Defendants' compliance with the Decree, identifying actual and potential areas of non-compliance with the Decree, facilitating the resolution of compliance issues without Court intervention, and recommending appropriate action by the Court in the event an issue cannot be resolved by discussion and negotiation among the Monitor, the Parties, and, with respect to provisions in Paragraphs 4-10, 25, and 45 of this Decree regarding Individuals who choose to receive ICF/MR services in an ICF-DD, the Intervenors. The Monitor may retain such staff and/or consultants as appropriate to assist in the performance of his or her duties.

32.     **Development of Measurable Standards for Evaluation.**

(a)     Within 90 days after the Monitor's appointment, the Monitor shall submit to the Parties and the Intervenors a set of objective standards to guide the Monitor in evaluating Defendants' compliance with the Decree. Intervenors may provide input to the Parties and the Monitor on the standards. In the event any of the Parties believe that such standards are insufficient or inappropriate, they shall first meet and confer with the Monitor in an effort to revise the standards in a manner acceptable to the Monitor and the Parties. In the event the Intervenors believe that such standards are insufficient or inappropriate with respect to Paragraphs 4-10, 25 and 45 of this Decree regarding Individuals who choose to receive ICF/MR services in an ICF-DD, they shall first meet and confer with the Monitor and the Parties in an effort to revise the standards in a manner acceptable to the Monitor, the Parties, and the Intervenors. In the event that following any such meet and confer, the Monitor, the Parties, and the

17

Intervenors are unable to agree on such standards, any of the Parties or the Intervenors may seek appropriate relief from the Court within 14 days after they meet and confer. Once finalized, the objective standards will be made publicly available.

(b)    Appropriate standards by which the Monitor evaluates Defendants' compliance with the Decree shall include, but are not limited to, the following:

(i)    whether Transition Service Plans meet the criteria set forth in Section VII;

(ii)    whether the benchmarks set forth in Sections VIII and IX and X have been satisfied;

(iii)    whether Class Members who are determined to be in Crisis receive services expeditiously in accordance with Paragraph 21;

(iv)    the extent to which, at periodic intervals, Class Members are being placed in Community-Based Settings; and

(v)    the extent to which, at periodic intervals, Class Members are receiving Community-Based Services.

(c)    None of the standards adopted by the Monitor pursuant to this Paragraph 32 shall in any way modify, change or otherwise abrogate any of the terms of the Decree or Defendants' obligations under the Decree.

33.    **Review and Evaluation of Data and Information**. The Monitor shall review and evaluate Defendants' compliance with the terms of the Decree. Not less than every six (6) months, Defendants shall provide to the Monitor, Plaintiffs, Class Counsel, Intervenors and Intervenors' Counsel and make publicly available, a detailed report containing data and information sufficient to evaluate Defendants' compliance with the Decree and Defendants' progress towards achieving compliance. Prior to the first report, the Parties and the Monitor will agree on the data and information that must be included in such reports. The Intervenors may provide input to the Parties and the Monitor on the proposed data and information. Defendants will not refuse any request by the Monitor for documents or other information that are

18

SA23

reasonably related to the Monitor's review and evaluation of Defendants' compliance with the Decree, and Defendants will, upon reasonable notice, permit confidential interviews of Defendants' staff or consultants, except their attorneys. The Monitor will have access to all Class Members and their records and files, as well as to those service providers, facilities, buildings and premises that serve, or are otherwise pertinent to, Class Members, where such access is reasonably related to the Monitor's review and evaluation of Defendants' compliance with the Decree. The Defendants shall comply with Plaintiffs' requests for information that are reasonably related to Defendants' compliance with the Decree, including without limitation requests for records and other relevant documents pertinent to implementation of the Decree or to Class Members. Class Counsel also shall be permitted to review the information provided to the Monitor. All information provided to the Monitor and/or Class Counsel pursuant to the Decree shall be subject to the Protective Order.

34.     **Reporting**. The Monitor shall file annual reports with the Court, which shall be served on all Parties and Intervenors and be made publicly available. Such reports shall include the information necessary, in the Monitor's professional judgment, for the Court, Plaintiffs, and Intervenors to evaluate Defendants' compliance or non-compliance with the terms of the Decree. The Monitor may file additional reports as necessary.

35.     **Compliance**. In the event the Monitor finds Defendants not in compliance with the Decree, the Monitor shall promptly meet and confer with the Parties in an effort to agree on steps necessary to achieve compliance. In the event the Monitor finds Defendants not in compliance with the Decree relating to provisions in Paragraphs 4-10, 25, and 45 of this Decree regarding Individuals who choose to receive ICF/MR services in an ICF-DD, the Monitor shall promptly meet and confer with the Parties and the Intervenors in an effort to agree on steps necessary to achieve compliance. In the event that Plaintiffs believe that Defendants are not complying with the terms of the Decree, Plaintiffs shall notify the Monitor and Defendants of Defendants' potential non-compliance. The Monitor then shall review Plaintiffs' claims of actual or potential non-compliance and, as the Monitor deems appropriate in his or her professional judgment, meet and confer with Defendants and Plaintiffs in an effort to agree on steps necessary to achieve compliance with the Decree. If the Monitor and Parties agree, such

19

SA24

steps shall be memorialized in writing and set forth in a separate Court Order supplemental to the Decree. In the event that the Monitor is unable to reach agreement with Defendants and Plaintiffs, the Monitor may seek appropriate relief from the Court. In the event that Plaintiffs believe that Defendants are not in compliance with the Decree and that the Monitor refuses or fails to act, Plaintiffs may seek appropriate relief from the Court.

In the event that Intervenors believe that Defendants are not complying with the terms of the Decree relating to provisions in Paragraphs 4-10, 25, and 45 of this Decree regarding Individuals who choose to receive ICF/MR services in an ICF-DD, Intervenors shall notify the Monitor and Parties of Defendants' potential non-compliance. The Monitor then shall review Intervenors' claims of actual or potential non-compliance and, as the Monitor deems appropriate in his or her professional judgment, meet and confer with the Parties and Intervenors in an effort to agree on steps necessary to achieve compliance with the Decree. If the Monitor, the Intervenors and Parties agree, such steps shall be memorialized in writing and set forth in a separate Court Order supplemental to the Decree. In the event that the Monitor is unable to reach agreement with Intervenors, Defendants and Plaintiffs, the Monitor may seek appropriate relief from the Court. In the event that the Intervenors believe that Defendants are not in compliance with the Decree and that the Monitor refuses or fails to act, Intervenors may seek appropriate relief from the Court.

The Monitor will not communicate with the Court without advance notice to the Parties and the Intervenors. Individuals who choose to receive ICF/MR services in an ICF-DD shall have the same rights as Class Members to enforce this Decree, provided however that such Individuals' rights to enforce this Decree shall be limited to enforcement of provisions in Paragraphs 4-10, 25, and 45 of this Decree regarding Individuals who choose to receive ICF/MR services in an ICF-DD.

36. **Compensation of the Monitor**. Defendants shall compensate the Monitor and his or her staff and consultants at their usual and customary rate. Defendants shall reimburse all reasonable expenses of the Monitor and the Monitor's staff, consistent with the guidelines set forth in the "Governor's Travel Control Board Travel Guide for State Employees." Defendants

20

SA25

reserve their right to seek relief from the Court if Defendants believe that any of the Monitor's charges are inappropriate or unreasonable.

## XV. NAMED PLAINTIFFS

37.     As part of the settlement of the Litigation, within sixty (60) days after Approval of the Decree, Defendants shall offer each of the Named Plaintiffs the opportunity to receive appropriate Community-Based Services or placement in a Community-Based Setting.  Provision of services to the Named Plaintiffs pursuant to this provision shall not be used to determine any other particular Class Member's eligibility for services under the terms of the Decree.

## XVI. ATTORNEYS' FEES AND COSTS

38.     In full settlement of all attorneys' fees incurred in connection with the Litigation, Defendants shall pay $1,740,000.00 to Class Counsel and $500,000.00 to Intervenors' Counsel. In addition, in full settlement of all out-of-pocket costs and expenses (not to include attorneys' fees) incurred by Class Counsel, Defendants shall pay to Class Counsel reasonable costs and expenses incurred by Class Counsel through and including the Approval of the Decree and any appeal thereof.  Class Counsel shall provide Defendants with their out-of-pocket costs and expenses and appropriate supporting documentation so that Defendants have an opportunity to review them and, if necessary, meet and confer with Class Counsel and bring any disputes before the Court.  Defendants shall pay one-half of the aforesaid amounts due Class Counsel and one-half of the aforesaid amount due Intervenors' Counsel in State Fiscal Year 2012 (which begins July 1, 2011) and one-half of the aforesaid amounts due Class Counsel and one-half of the aforesaid amount due Intervenors' Counsel in State Fiscal Year 2013 (which begins July 1, 2012).  All of the aforesaid amounts shall be distributed to Class Counsel and Intervenors' Counsel in the manner set forth in written instructions provided by Class Counsel and Intervenors' Counsel, respectively.  Furthermore, such amounts shall be set forth in one or more Judgment Orders to be entered by the Court within fourteen (14) days after Approval of the Decree.  Defendants shall complete and submit all paperwork necessary for payment of the first half of the aforesaid amounts, plus applicable statutory post-judgment interest, within (a) five (5) business days after expiration of the time to appeal the Decree without the filing of a Notice of Appeal, or after the issuance of the mandate by the highest reviewing court, whichever is later,

21

SA26

or (b) July 1, 2011, whichever is later. Defendants shall complete and submit all paperwork necessary for payment of the second half of the aforesaid amounts, plus applicable statutory post-judgment interest, on July 2, 2012.

39. Nothing herein shall preclude the Court from imposing sanctions or other relief for non-compliance with the Decree.

## XVII. MISCELLANEOUS PROVISIONS

40. **Approval of the Decree**. "Approval of the Decree" shall be deemed to occur on the date the Court enters the Decree.

41. **Costs of Notices**. The cost of all notices hereunder or otherwise ordered by the Court shall be borne by Defendants.

42. **Signatories**. Each undersigned representative of a Defendant to this Litigation and the Attorney General for the State of Illinois certifies that he or she is authorized to enter into the terms and conditions of the Decree and to execute and bind legally such Defendant to this document. Each undersigned representative of Plaintiffs and Class Counsel certifies that he or she is authorized to enter into the terms and conditions of the Decree and to execute and bind legally the Plaintiffs and Class Counsel to this document. Each undersigned representative of the Intervenors certifies that he or she is authorized to enter into the terms and conditions of the Decree and to execute and bind legally those individuals whom he or she represents to this document.

43. **Delivery of Notices or Mailings.**

    (a)     Delivery of notices or mailings to Plaintiffs shall be made to: Equip for Equality, Attn.: Barry Taylor (or his successor), 20 North Michigan Avenue, Suite 300, Chicago, Illinois 60602; and SNR Denton US LLP, Attn.: John Grossbart, 233 South Wacker Drive, Suite 7800, Chicago, Illinois 60606.

    (b)     Delivery of notices or mailings to Defendants shall be made to: Office of the Illinois Attorney General, Attn: Brent D. Stratton, 100 W. Randolph Street, Chicago, Illinois 60601 and Office of the Illinois Attorney General,

SA27

Attn: Karen Konieczny, 160 N. LaSalle St., Suite N-1000, Chicago, Illinois 60601.

(c)     Delivery of notices or mailings to Intervenors shall be made to: Scott M. Mendel, K&L Gates LLP, 70 W. Madison St., Suite 3100, Chicago, IL 60602, William Choslovsky, Neal, Gerber & Eisenberg, LLP, Two N. LaSalle St., Suite 1700, Chicago, IL 60602, James W. Ducayet, Sidley Austin LLP, One S. Dearborn, Chicago, IL 60603.

(d)     The Parties and Intervenors may modify the instructions for delivery of notices or mailings contained in this Paragraph 43 without Court approval.

44.     **Waiver**. Defendants have waived their right to oppose entry of the Decree by this Court or to challenge any provision of the Decree. Defendants have waived their right to appeal the Decree or any other matter that has occurred to date in connection with the Litigation.

45.     Nothing in this Decree alters the legal rights that Individuals with Developmental Disabilities, including Class Members, otherwise may have, including the right to choose to receive ICF/MR services in an ICF-DD. Nothing in this Decree alters the legal rights that an Individual with Developmental Disabilities otherwise may have to work directly (i) with the State-identified point of entry for developmental disability services and/or (ii) with an ICF-DD to be approved to move into a then-existing licensed vacancy in an ICF-DD, including a vacancy created by a departing resident.

46.     Nothing in this Decree alters the legal rights, authority, or responsibilities of the legal guardian(s) of any Individual with Developmental Disabilities under state or federal law or regulations.

## XVIII.   TERMINATION

47.     The Court shall retain exclusive jurisdiction to fully oversee, supervise, modify and enforce the terms of the Decree. The Court shall retain such jurisdiction for at least nine (9) years following the Approval of the Decree.

48.     The Parties, jointly or separately, may request termination of the monitoring process described in Section XIV at any time after nine (9) years from Approval of the Decree. If, after nine years from Approval of the Decree or any time thereafter, Defendants and the

23

SA28

Monitor agree that Defendants have substantially complied with the terms of the Decree, Defendants shall notify Plaintiffs and Intervenors in writing of their desire to terminate the monitoring process ("Termination Request").  Plaintiffs shall have not less than 120 days from receipt of the Termination Request to respond.  Intervenors may provide input to the Parties and the Monitor on the Termination Request.  During those 120 days, Plaintiffs shall have the opportunity to conduct reasonable discovery concerning factual issues relevant to the determination of compliance.  If Plaintiffs oppose the Termination Request, Plaintiffs must file a motion within 120 days from the date of receipt of Defendants' Termination Request.

49.     The Court will grant Defendants' Termination Request and terminate the monitoring process if the Court finds that Defendants have substantially complied with the terms of the Decree and the Court determines that Defendants have implemented and are maintaining a system that complies with the Decree.

50.     Termination of the Court's jurisdiction over the Decree may occur only in the event of a successful request to terminate the monitoring process pursuant to Section XVIII.  The Decree shall remain in effect, and the Court shall retain its jurisdiction over the Decree, until a final order is entered granting the Termination Request and all appellate rights and/or appeals have been exhausted.

SO ORDERED THIS 15th DAY OF JUNE, 2011.


_____
JAMES F. HOLDERMAN
Chief Judge, United States District Court


[SIGNATURE PAGE FOLLOWS]

SA29

**CERTIFICATE OF FILING AND SERVICE**

I certify that on April 8, 2026, I electronically filed the foregoing Brief and Short Appendix of Defendants-Appellants with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system.

All participants in this case are registered CM/ECF users and service will be accomplished by the CM/ECF system.

/s/ Jonathon M. Studer
JONATHON M. STUDER
Assistant Attorney General
115 South LaSalle Street
Chicago, Illinois 60603
(312) 814-0937 (office)
(312) 415-8065 (cell)
Jonathon.Studer@ilag.gov