No. 25-2510

IN THE
UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

| | | |
|---|---|---|
| STANLEY LIGAS, ISAIAH FAIR, JAMIE MCELROY, JENNIFER WILSON, DAVID CICARELLI, and BURTON A. BROWN | ) | Appeal from the United States District Court for the Northern District of Illinois |
| Plaintiffs-Appellees, | ) | |
| v. | ) | No. 1:05-cv-04331 |
| DULCE QUINTERO, in her official capacity as Secretary of the Illinois Department of Human Services, and ELIZABETH M. WHITEHORN, in her official capacity as Director of the Illinois Department of Healthcare and Family Services, | ) | The Honorable SHARON JOHNSON COLEMAN, Judge Presiding. |
| Defendants-Appellants. | ) | |

**REPLY BRIEF OF DEFENDANTS-APPELLANTS**


**KWAME RAOUL**
Attorney General
State of Illinois

**JANE ELINOR NOTZ**
Solicitor General

115 South LaSalle Street
Chicago, Illinois 60603
(312) 814-3000

Attorneys for Defendants-Appellants

**JONATHON M. STUDER**
Assistant Attorney General
115 South LaSalle Street
Chicago, Illinois 60603
(312) 814-0937 (office)
(312) 415-8065 (cell)
Jonathon.Studer@ilag.gov


**ORAL ARGUMENT REQUESTED**

## TABLE OF CONTENTS

**Page(s)**

TABLE OF AUTHORITIES ..... ii

ARGUMENT ..... 1

I. The consent decree has been satisfied. ..... 2

A. The State achieved the decree's objectives and implemented a durable remedy. ..... 2

B. The State substantially complied with the terms of the decree. ..... 6

1. The State substantially complied with its "reasonable pace" obligations, as plaintiffs previously agreed. ..... 6

2. The State substantially complied with its crisis obligations. ..... 13

3. The State substantially complied with its resource obligations. ..... 16

II. Applying the consent decree prospectively is no longer equitable. ..... 19

A. No ongoing systemic violation of federal law supports continued enforcement of the decree. ..... 20

B. Plaintiffs do not dispute the heavy federalism costs of the relief they seek. ..... 24

CONCLUSION ..... 27

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF FILING AND SERVICE

APPENDIX

## TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Ahern v. Bd. of Educ. of the City of Chicago*,
133 F.3d 975 (7th Cir. 1998) .......... 3-4

*Arc of Wash. State Inc. v. Braddock*,
427 F.3d 615 (9th Cir. 2005) .......... 22

*Bertrand v. Maram*,
495 F.3d 452 (7th Cir. 2007) .......... 22

*Clanton v. Oakbrook Healthcare Centre, Ltd.*,
2023 IL 129067 .......... 9-10

*Frew v. Hawkins*,
540 U.S. 431 (2004) .......... 26

*Frew v. Janek*,
5 F. Supp. 3d 845 (E.D. Tex. 2013), *aff'd*, 780 F.3d 320 (5th Cir. 2015) .......... 5

*Guggenberger v. Minnesota*,
198 F. Supp. 3d 973 (D. Minn. 2016) .......... 11, 21-22

*Holmes v. Godinez*,
991 F.3d 775 (7th Cir. 2021) .......... 7

*Horne v. Flores*,
557 U.S. 433 (2009) .......... 19-20, 23-25

*Ind. Prot. & Advocacy Servs. Comm'n v. Ind. Family & Soc. Servs. Admin.*,
149 F.4th 917 (7th Cir. 2025) .......... 25

*Jackson v. Los Lunas Cmty. Program*,
880 F.3d 1176 (10th Cir. 2018) .......... 3

*Jackson v. Los Lunas Cmty. Program*, No. 87-cv-839,
2016 WL 9777237 (D.N.M. June 14, 2016),
*vacated*, 880 F.3d 1176 (10th Cir. 2018) .......... 5

*John B. v. Emkes*,
710 F.3d 394 (6th Cir. 2013) .......... 6

*Lewis v. Casey*,
518 U.S. 343 (1996) .......... 14

*Mars Steel Corp. v. Cont'l Bank N.A.*,
880 F.2d 928 (7th Cir. 1989) .......... 20

*Olmstead v. L.C.*,
527 U.S. 581 (1999) .......... 11, 16-17, 20-21, 24

*Peery v. City of Miami*,
977 F.3d 1061 (11th Cir. 2020) .......... 2

*Salazar by Salazar v. D.C.*,
896 F.3d 489 (D.C. Cir. 2018) .......... 14

*Shakman v. Clerk of Cook Cnty.*,
994 F.3d 832 (7th Cir. 2021) .......... 26

*Shakman v. Pritzker*,
43 F.4th 723 (7th Cir. 2022) .......... 2, 5, 15, 23

*Thompson v. Gordon*,
241 Ill. 2d 428 (2011) .......... 9

*United States v. Armour & Co.*,
402 U.S. 673 (1971) .......... 3-4

*United States v. ITT Continental Baking Co.*,
420 U.S. 223 (1975) .......... 4

**Rules**

Fed. R. Civ. P. 60(b)(5) .......... 2, 19

## ARGUMENT

After more than a decade of federal court oversight, more than $1 billion in additional annual spending, and community services delivered to 13,000 class members, the State asked the district court to vacate the 2011 consent decree because it had been satisfied or, alternatively, because applying it prospectively was no longer equitable. The district court denied the motion without analysis, identifying no legal standard, no factual findings, no unsatisfied obligations, and no ongoing violations of federal law. As the State's opening brief explained, that decision was badly flawed: the State has substantially complied with the obligations imposed by the decree, and there is no serious argument that there are systemic, ongoing violations of federal law that would warrant continued supervision by an Article III court.

Plaintiffs' response confirms that the district court's decision should be reversed, and the decree vacated, for two independent reasons. First, the decree has been satisfied. The State achieved the decree's objectives, implemented a durable remedy, and substantially complied with the decree's terms. Plaintiffs' primary argument to the contrary hinges on their new interpretation of the State's obligation to select individuals off a waitlist at a "reasonable pace" — an obligation that plaintiffs previously admitted the State was "meet[ing] and exceed[ing]." Plaintiffs' other arguments either impact less than 2% of the class or rest on benchmarks proposed by plaintiffs or the monitor but found nowhere in the decree or federal law. Second, and regardless, continued enforcement is no longer equitable. Neither

plaintiffs nor the district court have identified an ongoing systemic violation of federal law that supports continued federal oversight. Today, Illinois operates a system endorsed by *Olmstead* — one that effectively moves qualified persons with developmental disabilities to less restrictive settings at a reasonable pace. The grave federalism costs of keeping the State under the supervision of a federal court — absent any evidence of systemwide violations of federal law — require terminating the decree.

## I. The consent decree has been satisfied.

The decree should be vacated because it has been "satisfied." Fed. R. Civ. P. 60(b)(5); AT Br. 33-47. The State both achieved the decree's fundamental objectives and implemented a durable remedy to avoid systemic future violations of federal law, *id.* at 34-37, and it substantially complied with the decree's terms, *id.* at 37-47.

### A. The State achieved the decree's objectives and implemented a durable remedy.

The "controlling question" for satisfaction is whether the State achieved the decree's objectives and implemented a durable remedy to avoid future systemic violations. AT Br. 33; *Shakman v. Pritzker*, 43 F.4th 723, 728, 730 (7th Cir. 2022); *Peery v. City of Miami*, 977 F.3d 1061, 1075 (11th Cir. 2020). The decree's objective was to eliminate the systemic barriers to community integration alleged in plaintiffs' complaint, and the State has removed every such barrier. AT Br. 34-37.

Plaintiffs largely do not dispute the State's summary of the alleged systemic barriers that prompted the lawsuit and decree. *See id.*; AE Br. 4. Nor do they dispute that the State has changed its policies and procedures to remove the alleged

barriers, AE Br. 40, invested more than $1 billion in new annual spending, substantially increased wages for frontline workers, *id*. at 3; AT Br. 16, and served 13,000 class members since the decree was entered, Doc. 829 at 1, or the district court's observation that the system had improved so much that although certain individuals may have his or her "own individual case, . . . as far as the system as a whole, . . . we are nowhere where we were before," Doc. 859 at 10.

Likewise, plaintiffs do not meaningfully dispute that the transformation is a "durable remedy": the system and funding changes are steadfast, not "fleeting," and the State has shown "sustained good-faith efforts to remedy federal violations and, to the extent possible, eliminate the vestiges of the federal violation." *Jackson v. Los Lunas Cmty. Program*, 880 F.3d 1176, 1203 (10th Cir. 2018); AT Br. 36-37. The State showed that its re-designed policies remain in effect, it consistently raised wage rates and annual spending, and it continually increased the number of people served, as well as that the monitor repeatedly praised the State's "strong efforts," "unfailing and ongoing cooperation," and "systematic approach toward compliance." Doc. 565 at 6; AT Br. 18-19.

Unable to seriously dispute the scope or nature of the changes the State has made, plaintiffs raise a handful of methodological disputes. All lack merit.

Plaintiffs first argue that this court may not consult their complaint, the relief sought, or the parties' stated reasons for entering the decree because *Armour* confines the court's inquiry to the decree's four corners. AE Br. 41 (citing *United States v. Armour & Co.*, 402 U.S. 673 (1971), and *Ahern v. Bd. of Educ. of the City of*

*Chicago*, 133 F.3d 975 (7th Cir. 1998)). But plaintiffs overread *Armour*. The Court there declined to *expand* decree obligations based on the scope of a complaint because a consent decree reflects a compromise where plaintiffs "give up something they might have won." 402 U.S. at 681-82. *Armour* does not prevent courts from considering the complaint and the circumstances that gave rise to a decree in adjudicating a motion to vacate. *Ahern*, 133 F.3d at 981 ("we are entitled to look to the complaint to ascertain the scope of the lawsuit that the decree was intended to settle"); *accord United States v. ITT Continental Baking Co.*, 420 U.S. 223, 238 (1975).

Second, plaintiffs criticize the State for relying in part on evidence compiled during compliance proceedings — including the yearly implementation plan updates prepared with input from plaintiffs and the monitor, *see* Doc. 549 at 14-16 — as opposed to, for example, witness testimony, AE Br. 24-26, 40.[1] Although plaintiffs moved to exclude reference to certain evidence, Doc. 849, the district court denied that motion, Doc. 854. And setting aside that the district court did not request witness testimony, plaintiffs' complaints about the record lack merit: As the court recognized, the record contained "tons and tons of paper," including a decade's worth of "very thorough" reports by the monitor, Doc. 834 at 22-24, and the yearly implementation plan updates, *see* Doc. 549 at 14-16.

[1] Plaintiffs criticize the State for citing materials that postdate the district court's order, AE Br. 23-24, but those materials merely illustrate the State's continued diligence to comply with the decree. Regardless, the record contained ample evidence to support vacatur.

Other courts have allowed movants to shoulder their Rule 60(b) burden by relying on an evidentiary record compiled during compliance proceedings, including where, as here, a monitor has worked for years to oversee compliance. *See, e.g.*, *Shakman*, No. 69-cv-2145, Doc. 6946 (motion to vacate supported by two exhibits leading to vacatur in *Shakman*, 43 F.4th 723); Docs. 2053, 2063, *Jackson v. Los Lunas Cmty. Program*, No. 87-cv-839, 2016 WL 9777237 (D.N.M. June 14, 2016), *vacated*, 880 F.3d 1176 (10th Cir. 2018) (treating reports issued by court-appointed compliance administrator as primary record against which to evaluate State's motion to terminate); *Frew v. Janek*, 5 F. Supp. 3d 845, 852 (E.D. Tex. 2013), *aff'd*, 780 F.3d 320 (5th Cir. 2015) (relying on quarterly monitoring reports filed by State to assess compliance). Indeed, plaintiffs themselves rely on such materials (specifically, an implementation plan update). *See* AE Br. 30 (citing Doc. 719).

As for plaintiffs' assertion that the State "repeatedly invok[es] its lawyers' arguments as evidence" on appeal, AE Br. 24-25, that is incorrect. Of the seven documents plaintiffs cite, two are implementation plan updates prepared with plaintiffs' input (Docs. 775, 819); three are post-appeal submissions cited to show the State has continued its efforts (Docs. 918, 930, 942); and the final two provide background context — a status report (Doc. 771) showing one of many times the State told the court without objection that it was exceeding "reasonable pace" requirements, AT Br. 47, and a response to a monitor report (Doc. 828) cited only for the fact of the response, AT Br. 25.

Third and finally, plaintiffs contend that the systemwide transformation is not a "durable remedy" because, under their reading of the decree, the State is not compliant with its "reasonable pace," crisis, or community resources obligations. AE Br. 42. But that argument rests on plaintiffs' view that the State has not complied with specific decree terms — a view that is mistaken. *Infra* pp. 6-18. At bottom, there is no serious argument that the State would not "continue [its] compliance in the absence of continued judicial supervision," *John B. v. Emkes*, 710 F.3d 394, 412 (6th Cir. 2013).

### B. The State substantially complied with the terms of the decree.

Even if "satisfaction" requires substantial compliance with every individual provision of the decree and post-decree agreements, AE Br. 26, the State has met that standard, AT Br. 37-47. The decree imposed six primary obligations on the State, *id.* at 12-14, and plaintiffs concede that three have been met, AE Br. 27 n.17. Plaintiffs dispute only the State's compliance with the "reasonable pace," crisis, and resourcing obligations. But their disagreement on "reasonable pace" rests on their newly adopted (and incorrect) reading of that provision, and their arguments on the other issues amount to a complaint that the State has not raised and spent enough money fast enough to meet extra-decree benchmarks.

#### 1. The State substantially complied with its "reasonable pace" obligations, as plaintiffs previously agreed.

Plaintiffs' principal ground for continued federal oversight, AE Br. 28-31, is the State's compliance with obligations that plaintiffs previously agreed the State was "meet[ing] and exceed[ing]." Doc. 754 at 6-7. As explained, the State has

substantially complied with the parties' "reasonable pace" agreement — *i.e.*, it has continuously served more than 630 people each year, and it has largely selected individuals such that they do not remain on the waitlist for more than 60 months. AT Br. 22, 41. Plaintiffs do not dispute the State's compliance with the 630-person yearly service obligation. AE Br. 28-31. Instead, they argue that the 60-month selection requirement should be understood as an obligation to not only select, but also *serve*, everyone within five years — and, under that view, the State's efforts have fallen short. *Id.* This argument rests on contractual interpretation, *id.* at 30-31, a question of Illinois law reviewed *de novo*, *see Holmes v. Godinez*, 991 F.3d 775, 780 (7th Cir. 2021).

The "reasonable pace" agreement imposes two separate obligations: a selection obligation and a service obligation. First, the selection obligation requires the State to "conduct[ ]" annual "selections" from the waitlist and send selection letters to those individuals. Doc. 719 at 29. Once selected, an individual is authorized to work with an independent service coordinator to complete eligibility and move toward the initiation of services. Doc. 754 at 7. The metric for selection is *not* based on "the number of individuals . . . who [e]nter [s]ervice." Doc. 719 at 29. The State instead agreed that "selections [would] be tailored such that by the FY2025 selection, no individual will wait on PUNS for over 60 months." *Id.* In other words, properly construed, the "reasonable pace" agreement requires that an individual who has requested community services by joining the waitlist receive a selection letter

within 60 months, which enables the individual to work with a service coordinator to identify a suitable home.

Critically, the "reasonable pace" agreement does not allow the State to force an individual to accept a private provider, or vice versa. Thus, the agreement set no time limit by which an individual with a selection letter must begin receiving services. However, to ensure that class members were transitioned to the community at a "reasonable pace," the State "agree[d] to serve a minimum of 630 individuals from the PUNS list each year," following a starting point of "600 individuals selected from the PUNS list" in 2020. Doc. 719 at 29. The agreement specified how to measure the service obligation:

> Reasonable Pace will be measured based on the number of individuals in the "Seeking Services" category of the PUNS list who Enter Service under the Waiver during a 12-month period…. "Enter Service" means those who have begun receiving services under the Waiver (Home-Based or CILA), as reported by the ISCs. *This figure (600 and 630 per year as set forth below) is not dependent on the date on which the individual was selected from PUNS but may include individuals from any previous PUNS selection who enter service during the reporting period*[.]

*Id.* (emphasis added). That is, the State agreed that 630 people with a selection letter — regardless of when they received the letter — would begin receiving community services each year.

The agreement's plain language, its structure, and the parties' course of performance confirm the State's interpretation: the 60-month wait limit applies to the time for "selection" from the waitlist — a step the State controls — rather than the initiation of services, which turns substantially on class members' own choices

and private providers. Plaintiffs' interpretation, by contrast, mixes and matches the metrics for the two obligations (selection and service), while ignoring the parties' choice of different words to describe those obligations and plaintiffs' prior conduct.

The agreement's plain language, "construed as a whole," *Thompson v. Gordon*, 241 Ill. 2d 428, 441 (2011), establishes that the State's interpretation is correct. That is so for multiple reasons.

First, the agreement used different terms to describe different obligations. Where the parties defined the State's obligations to provide services, they wrote that the State agreed "to serve" a specified number of individuals. Doc. 719 at 29. But, in defining the selection obligation, they did not write that selections would be tailored so that class members would be *served* within 60 months; nor did they link the 60-month deadline to the defined term "Enter Service." *See id.* (instead stating that "no individual will wait on PUNS for over 60 months"). It is presumed that the parties chose different terms for a reason. *See Thompson*, 241 Ill. 2d at 442. The State's interpretation stays true to this principle. Plaintiffs, by contrast, ignore the different terms, and ask the court to revise the agreement from "no individual will wait on PUNS for over 60 months," Doc. 719 at 29, to "no person would wait more than 60 months to Enter Services," AE Br. 30-31. Had the parties intended to link the selection obligation to the service obligation, they could have done so. But they did not.

Second, the State's interpretation harmonizes every provision, whereas plaintiffs' does not. *See Clanton v. Oakbrook Healthcare Centre, Ltd.*, 2023 IL

129067, ¶ 34 (interpreting agreement to harmonize and give effect to all provisions while not rendering any language superfluous). Receiving a selection letter gives class members the ability to choose a willing provider, rather than a forced match, and they often seek a long-term home that best matches their disability, geographic location, and preferences. The State's interpretation accounts for agreement provisions recognizing it may take time for class members to find a mutually agreeable home. For instance, the agreement says that the annual number of individuals served "may include individuals from any previous PUNS selection who enter service during the reporting period," Doc. 719 at 29 — reflecting the parties' understanding that there may be a gap between selection and service, during which selected class members find the home that best suits them. *Accord, e.g.*, *id.* (giving notice about six months before selection "to encourage early planning"); *id.* (providing for a second yearly selection if there is "unused targeted capacity"). Plaintiffs offer no explanation for these provisions.

Third, plaintiffs' interpretation would produce an unworkable obligation that the parties could not have intended — indeed, one that exceeds what the State is required to do under the ADA. Plaintiffs argue that the State must ensure that no person "wait[s] more than 60 months to Enter Service." AE Br. 30-31. As plaintiffs and the monitor recognized, however, the availability of private providers can depend on how much the State pays. *E.g.*, Doc. 627 at 21 (monitor: despite "best efforts of truly committed [state] professionals," availability of private providers was limited by state budget); Doc. 853 at 19 (plaintiffs: $1 billion annual spending increase was not

"remotely sufficient" to provide required services). Under plaintiffs' view, the reasonable-pace agreement requires the State to fund whatever the market demands for high quality, community services of every eligible person's choice within five years. As plaintiffs' cited authority recognizes, however, that exceeds the State's statutory obligations. *See Olmstead v. L.C.*, 527 U.S. 581, 603 n.14 (1999) (ADA does not set a "standard of care" or require States to "provide a certain level of benefits to individuals with disabilities"); *Guggenberger v. Minnesota*, 198 F. Supp. 3d 973, 1012 (D. Minn. 2016) (not a violation of federal law to cap waiver services, to use priority criteria to allocate services, or to not provide services when no waiver slot is available). Moreover, plaintiffs' interpretation conflicts with the decree's funding provisions, which state that defendants had no obligation to change their current funding methods, Doc. 549 at 7, ¶ 4, and bound defendants to submitting annual budgets that "*request* sufficient funds necessary to develop and maintain the services, supports and structures described in the Decree," *id.* at 7-8, ¶ 5 (emphasis added).

Finally, plaintiffs' interpretation conflicts with their prior admissions and the parties' course of conduct. In August 2021, the parties jointly represented that the State "continues to meet and exceed the Reasonable Pace requirements," Doc. 754 at 6-7, 11 — which would have been incorrect under plaintiffs' current reading. And neither plaintiffs nor the monitor identified any issue with reasonable pace until the State moved to vacate the decree. AT Br. 41.

Plaintiffs contend that they were unaware of how the State reported its performance until the motion to vacate, AE Br. 11, but that is implausible. The

parties' joint filing included statements showing that plaintiffs understood the reasonable-pace calculations. With respect to the service obligation, it stated that "the State exceeded its Reasonable Pace requirement for FY21, requiring that 630 individuals enter into services." Doc. 754 at 6-7, ¶ V.a. And with respect to the selection obligation, the joint report stated that "[o]n July 12, 2021, DDD sent 1,593 PUNS selection letters" and "[a]ll eligible adults seeking services with a time waiting of 57 months or more are included in this selection." *Id.* at 7, ¶ V.b. These representations clearly reflect the parties' agreement that the selection obligation is complete when the State sends a selection letter, not when the individual in question begins to receive services. Likewise, although plaintiffs criticize the State because most people selected from the waitlist in July 2023 had not entered services six months later, AE Br. 29-30, the joint filing demonstrates that plaintiffs were aware of similar facts when they agreed that the State was complying with the reasonable-pace agreement, *see* Doc. 754 at 6-7 (approximately 13 months after the July 2020 selection, only 516 out of 1,569 selected individuals had entered services).[2]

In short, the agreement's text and purpose, as well as the parties' course of conduct, establish that it obligated the State to select individuals from the waitlist within 60 months, not to initiate services. The State substantially complied with that obligation. AT Br. 41.

---

[2] Although plaintiffs argue that the State changed its position, AE Br. 19, and point to a mistaken statement in the State's motion to vacate that tied the 60-month timeframe to when class members "enter services," AE Br. 12 (citing Doc. 837, ECF14752-53), the plain language of the decree and the parties' joint filing show that the State's interpretation is correct and was shared by plaintiffs.

### 2. The State substantially complied with its crisis obligations.

Plaintiffs' second argument for continued oversight is that the State has failed to adequately provide "crisis services" to class members. AE Br. 31-34. But that argument is incorrect for at least two independent reasons.

First, plaintiffs' understanding of the "crisis" obligation as allowing only 72 hours to provide community services has no home in the complaint or the decree. As pleaded, this case was not about the timeliness of crisis services; rather, plaintiffs complained that the State made community services available "only" in crisis situations. Doc. 436 at 2-3. The decree remedied that barrier by making services available *without* a crisis, AT Br. 16, 35, while the State also agreed to continue serving those in crisis "expeditiously," Doc. 549 at 12. Recognizing that immediate community placements may be impossible, the decree did not specify a particular timeframe for provision of community services and allowed the "provision of interim emergency services (including interim placement in an [Intermediate Facility] where no placement in a Community-Based setting was immediately available)[.]" *Id.* at 11, ¶ 21(a); *see also id.* at ¶ 21(c) (allowing interim placement outside community settings).

Second, the State has substantially complied with its decree obligations to serve those in crisis expeditiously, and the issues raised by plaintiffs affect less than 1% of class members. Although plaintiffs attack the State's statement that it has served "nearly 3,700 people in crisis over the life of the [d]ecree," AE Br. 32-33, that figure is confirmed by plaintiffs' exhibit, Doc. 853-9 at 7, and they offer no serious

reason to question it. Plaintiffs also agreed that the State has uncapped the number of people served through crisis funding, Doc. 829 at 1, and the monitor's review showed that the State moves quickly by reviewing 95% of crisis applications within three days, Doc. 808 at 7.

Nonetheless, plaintiffs attack the State's handling of individuals in crisis, AE Br. 33-34, but, as previewed, AT Br. 43-44, the issues impact less than 1% of the class. It does not "belittle[ ]" anyone to point out that the 59 individuals that the monitor found to have waited more than 3 days for crisis authorization represented less than 0.3% of the class. *See* AE Br. 33. Indeed, courts must consider whether there is evidence of systemwide failures or merely "one-off errors," *Salazar by Salazar v. D.C.*, 896 F.3d 489, 500 (D.C. Cir. 2018), when assessing a motion to vacate. *Accord Lewis v. Casey*, 518 U.S. 343, 359-60 (1996) (systemwide relief requires systemwide impact). And although plaintiffs focus on the "problems" the monitor identified for these individuals, these problems are not violations of the decree, let alone federal law. The monitor reported that 59 people did not receive service authorization within 3 days (with 40 individuals receiving authorization within 4-9 days and 19 individuals waiting longer). Doc. 808 at 5-6. But the 3-day benchmark does not stem from federal law or even from the decree; it comes from a 2012 report by the monitor, Doc. 565, that acknowledged that the appropriate "timeframe may vary, depending on individual circumstances, or if temporary services are in place to address the immediate crisis," *id.* at 22. It cannot be that the State failed to substantially comply with the decree by failing to provide 0.3% of class

members with services on a timeframe found nowhere in the decree. Nor did the State treat "as unworthy of bother" the number of people who entered institutions in crisis. *See* AE Br. 34 (citing AT Br. 46). Rather, the State explained that the 195 class members in state facilities represented less than 1% of the class, and the relevant number was far smaller because the guardians of 139 of those 195 individuals would not agree to placement in community settings. AT Br. 46.[3]

Plaintiffs finally criticize the State for previously failing to adequately collect data on individuals in crisis. AE Br. 33-34. But plaintiffs agreed in the district court that, shortly after they raised this concern, the State addressed it by adopting a "new, more transparent system." Doc. 853 at 23-24. That updated data showed, among other things, that, as of March 2024, an average of 95 people each month had open "crisis" applications. Plaintiffs suggest that this figure reflects noncompliance with the decree, but even assuming the State had not met obligations to these individuals, the failure to provide more timely services to approximately 100 people — totaling 0.5% of the class — is not the kind of systemic violation that could warrant the decree's continued enforcement. *Shakman*, 43 F.4th at 731 ("We cannot let perfect be the enemy of the constitutionally adequate."). At bottom, the State has substantially complied with its crisis obligations.

[3] An updated analysis required by the court in 2026 showed that there were only 19 class members in state facilities, 13 of whom entered in crisis. Doc. 960 at 4-5.

### 3. The State substantially complied with its resource obligations.

Plaintiffs' remaining arguments, AE Br. 35-41, reduce to a claim that the State has not raised and spent enough money fast enough. Consistent with *Olmstead*, 527 U.S. at 603 n.14, however, the decree does not require the State to change its funding methods or otherwise reach a particular level of spending, adopt a consultant's recommended timeline for wage increases, or cause private providers to score 85% on the monitor's 200-item quality survey. *Contra* AE Br. 35-40. It requires the State to "implement sufficient measures to ensure the availability of services, supports and other resources of sufficient quality, scope and variety to meet their obligations to such Individuals under the Decree and the Implementation Plan." Doc. 549 at 7.

As explained, the State has substantially complied with its resource obligations by designing and implementing a system in which class members are informed of their community-based options; assessed for eligibility; offered a choice between intermediate facilities, on one hand, and community services and settings, on the other; and, if not served immediately, placed on a waitlist from which they are served at a reasonable pace. AT Br. 15-16, 41-42. And the State has supported that system, including by increasing annual spending from $728 million to more than $1.8 billion, increasing the wages for frontline workers, and expanding the waiver program's capacity. *Id*. at 16-18, 42. The effect of the State's efforts is undeniable: as plaintiffs acknowledged, the State served approximately 13,000 class members between the decree's entry and October 2023. Doc. 829 at 1. And while plaintiffs quibble with the State's citations, they do not dispute the core resource facts. For example, they

criticize the State's motion for not citing evidence of expanded waiver capacity. AE Br. 13. But their allegations and exhibits confirm the expanded capacity. *See* AT Br. 17 (citing Doc. 436 at 18 and Doc. 853-9 at 18) (plaintiffs' complaint, which alleged that Illinois's waiver program had "only 14,000 waiver slots," and their exhibit, which showed that, by December 2023, the waiver program supported more than 23,000 individuals).

Plaintiffs' arguments largely flow from the State's alleged noncompliance with third-party reports and recommendations that are not incorporated into the decree. For instance, plaintiffs fault the State for being "40% behind" the Guidehouse recommendations, AE Br. 35, but those recommendations were not in the decree, and the State did not agree to implement them on a fixed schedule, AT Br. 44-45. Rather, the State explained that the Guidehouse recommendations would require the legislature to appropriate "hundreds of millions of new dollars" against competing budgetary demands, and thus they would need to be phased in over a longer period. Doc. 747 at 4; AT Br. 20. Nor can the State be noncompliant because the legislature increased the minimum wage. *See* AE Br. 35-36. The integration mandate is an antidiscrimination provision; it does not index rates to a wage floor, and it does not require States to "provide a certain level of benefits to individuals with disabilities." *Olmstead*, 527 U.S. at 603 n.14.

Plaintiffs would also condition substantial compliance on private providers scoring 85% across the monitor's 200-item survey. AE Br. 37-38. Again, that survey does not stem from the decree or federal law. AT Br. 45-46. Although the district

court ordered the State to participate in discussions concerning the survey topics, Doc. 710 at 2, the State never agreed that the survey would become part of the decree, and it had no input on the monitor's chosen threshold of 85%, *e.g.*, Doc. 837 at 19-20 (disputing threshold), which, like the survey, does not come from the law or the decree, *see* Doc. 859 at 33 (monitor's explanation of threshold). Regardless, on the survey's own terms, private providers performed well. Between 2019 and 2023, overall performance rose from 61% to 79%. Doc. 807 at 35. The providers scored at least 85% in eight domains — including safety, staffing and staff competence, healthcare, dietary support, protection from harm, and rights and autonomy — and at least 70% in six more, including person-centered planning and outcomes, as well as behavior and mental health supports and services. Doc. 807 at 35-36.

Plaintiffs single out one score that they describe as "community integration and access" and call the "[c]ore purpose of the decree." AE Br. 38. That domain is actually "Employment/Day Activities, Community Integration," Doc. 807 at 35, and the low-scoring items within it concerned employment supports, planned activities, senior day programs, and adult education opportunities, *id.* at 16-17, 35. Neither the complaint nor the decree mentions these measures, which are not required by federal law. While they might be good policy, they are not an appropriate metric of whether a federal court should continue its systemwide supervision of the State's programs. Nevertheless, as reflected in implementation plan updates, the State has continued to improve employment supports and opportunities. *E.g.*, Doc. 876 at 13-15.

## II. Applying the consent decree prospectively is no longer equitable.

This court may also reverse the denial of the motion to vacate on the alternate ground that continued enforcement of the decree is "no longer equitable." Fed. R. Civ. P. 60(b)(5); AT Br. 48-55. Because the State identified changed circumstances — namely, a decade of work to remedy the alleged violations of federal law — the district court was required to conduct a "proper analysis," including by making "up-to-date factual findings," to determine whether an ongoing systemic violation of federal law warranted continued enforcement. *Horne v. Flores*, 557 U.S. 433 (2009); AT Br. 48-50. That inquiry is particularly important in institutional reform litigation because consent decrees "raise sensitive federalism concerns" and divert finite public funds from programs whose beneficiaries are not before the court. *Horne*, 557 U.S. at 447-50.

The district court did not conduct the required *Horne* analysis: the minute order denying the State's motion did not apply the correct legal standard, make any factual findings, or identify any ongoing violation of federal law. Doc. 858. Plaintiffs make no serious effort to defend the district court's unreasoned decision, arguing only that the court's failure to comply with *Horne* can be overlooked because the State "did not . . . present reliable, admissible evidence." AE Br. 47. If that were the basis for the district court's decision, it could have said so. But, as discussed, and as the court recognized, the record includes a decade's worth of monitor reports, implementation plan updates, and more — the sort of documents courts often rely on in assessing compliance with a consent decree, *supra* pp. 4-5. Nor can the district

court's failure to conduct the analysis be overlooked based on "the standard deference due Rule 60(b)(5) orders," AE Br. 49, both because *Horne* imposes specific requirements for institutional reform decrees and because deference only attaches to an actual exercise of discretion, *see Mars Steel Corp. v. Cont'l Bank N.A.*, 880 F.2d 928, 936 (7th Cir. 1989) ("Until discretion has been taken seriously in the district court and exercised conscientiously, the basis for deference is missing.").

That said, this court should reverse rather than remand. A remand would only repeat what has twice failed. Ten months after the State filed its motion for reconsideration reiterating the required *Horne* analysis, the district court erroneously denied the motion as "moot" while delegating the question of what constitutes "substantial compliance" to a new monitor. AT Br. 54.[4] But it is the *court's* job to decide whether the State has substantially complied with the decree, not the monitor's, and the record admits only one answer: there is no ongoing systemic violation of law, and the federalism costs of continued oversight are largely undisputed and continue to mount.

### A. No ongoing systemic violation of federal law supports continued enforcement of the decree.

Illinois operates a system that *Olmstead* endorsed. It has a "comprehensive, effectively working plan for placing qualified persons with mental disabilities in less

---

[4] Plaintiffs assert that the State waived a challenge to the denial of reconsideration, AE Br. 48-49, but the State identified that order in its notice of appeal, Doc. 897, and argued in its opening brief that the district court erred in striking the motion as "moot," Doc. 895; *see* AT Br. 3 — reasoning that plaintiffs do not defend. Regardless, the court erred in denying the motion because the record amply demonstrated that vacatur was warranted, for all the reasons discussed here.

restrictive settings, and a waiting list that move[s] at a reasonable pace not controlled by the State's endeavors to keep its institutions fully populated." *See Olmstead*, 527 U.S. at 605-06. The State is not required to eliminate institutions, may not force individuals to accept community settings they do not want, and must have "leeway" to "maintain a range of facilities and to administer services with an even hand." *Id.* at 605. As explained, the State redesigned its system and secured funding to eliminate the systemic barriers alleged in plaintiffs' complaint. AT Br. 50-51. And it worked: as plaintiffs concede, the system served approximately 13,000 class members between 2011 and 2023. *Id.*; Doc. 829 at 1.

Like the district court, *see* Doc. 858; Doc. 859 at 10, plaintiffs are unable to identify an ongoing systemic violation of federal law that warrants ongoing enforcement. *See* Doc. 853 (not identifying any such violation); AE Br. 46-47. Plaintiffs state that people are on the waitlist for more than five years, with "many" waiting seven years or more. AE Br. 46. As discussed, *supra* pp. 6-12, this is consistent with the parties' express agreement, and regardless, it is consistent with federal law. Contrary to plaintiffs' argument, neither *Guggenberger* nor *Olmstead* suggests that "three to five years may violate reasonable pace." AE Br. 43. In fact, *Olmstead* blessed waitlists for community services where movement is not limited by the State trying to keep its institutions full. 527 U.S. at 606. And *Guggenberger* — an out-of-circuit district-court opinion — held that the plaintiffs stated an ADA claim not based on the length of their wait, but because the State allegedly failed to spend more than $1 billion in appropriated funds and to fill unused waiver capacity, leaving

people to wait for no legitimate reason. 198 F. Supp. 3d at 988, 1030-31. Here, by contrast, the State has increased its annual spending by $1 billion. AT Br. 16.

Instead, *Guggenberger* and the authority it relies on confirm there is no systemic violation of federal law here. *Guggenberger* recognized that "states may impose caps on their total Waiver Services allocation, use priority criteria to allocate services according to need, or use a method that incorporates both of these limits." 198 F. Supp. 3d at 1012 (citing *Bertrand v. Maram*, 495 F.3d 452, 458 (7th Cir. 2007)). And the Ninth Circuit's decision in *Arc of Wash. State Inc. v. Braddock*, 427 F.3d 615 (9th Cir. 2005), on which *Guggenberger* relied, confirms the point. There, the court held that Washington had a "comprehensive, effectively working plan" despite a waitlist that "admit[ted] new participants when slots open up" because Washington expanded its waiver program to serve nearly 10,000 people, increased its annual budget to $350 million, and provided that all eligible individuals would have an opportunity to participate in the program once space became available. *Arc of Wash. State*, 427 F.3d at 619-22. Given Washington's "genuine, comprehensive and reasonable" commitment to deinstitutionalization, there was "no cause for tinkering" with the State's program. *Id.* at 621. Illinois has done all that and more. It expanded its waiver program to serve nearly 25,000 individuals, increased its annual community services spending to more than $1.8 billion, and affords every eligible individual an opportunity to participate as capacity opens. AT Br. 15-18; *see also id.* at 18-19 (summarizing monitor's recognition of State's genuine and comprehensive commitment to deinstitutionalization).

Plaintiffs' counterarguments fail. They first assert that the State's efforts to transform its system cannot constitute "changed circumstances" warranting re-evaluation under *Horne* because those efforts were aimed at decree compliance. AE Br. 45-46. *Horne* rejected such a narrow approach. In holding that the lower courts incorrectly focused on whether the State satisfied a decree's incremental funding requirement, *Horne* held they should have asked whether the underlying violation of federal law had been remedied, not how the State got there. 557 U.S. at 459. *Horne* also explained why the analysis of institutional reform decrees must be "flexible": when state officials inherit "overbroad . . . consent decrees," they are "constrained in their ability to fulfill their duties as democratically-elected officials." *Id.* at 449. Were plaintiffs correct that the *Horne* analysis excludes efforts taken toward decree compliance, then courts would almost never be able to reevaluate decrees as inequitable. *Horne* rejects that approach.

Second, plaintiffs seek to hold the State to a burden unsupported by law. They defend the district court's denial of the motion to vacate principally on ground that "[t]he State has not proved that it has ended systemic violations of class members' rights under federal law." AE Br. 46. But having shown that it implemented a durable remedy that removes the alleged barriers to community integration, *supra* pp. 2-6, the State did not need to "prove a negative" by "show[ing] that no constitutional violations, whether measured at the individual level or more systemically, have recently occurred or will recur." *See Shakman*, 43 F.4th at 730. The demand that the State prove the absence of violations is stranger still on this

record because no court *ever* found that a systemic violation occurred. The State denied liability, and the decree says so. Doc. 549 at 3; *see also* Doc. 522-1 at 24 (plaintiffs' acknowledgment that they were "mindful of the hurdles to establish Defendants' liability and overcome any affirmative defenses"). Plaintiffs thus ask this court to require the State to prove that it ended violations that were never found to have occurred. No decision imposes such a requirement, and its consequence would be intolerable: no State would settle litigation to avoid a trial if the result were to require indefinite judicial supervision until the State affirmatively proved compliance with federal law.

### B. Plaintiffs do not dispute the heavy federalism costs of the relief they seek.

On the other side of the ledger, plaintiffs do not dispute the heavy federalism costs of their position. *See* AT Br. 51-54; AE Br. 47-48. They do not dispute that they seek new spending of hundreds of millions of dollars every year, AT Br. 48-49, or that the effect of requiring the State to further increase spending to the degree and at the pace plaintiffs want would be to divert taxpayer funds from individuals and programs not represented in these proceedings, *id*. at 52; *Horne*, 557 U.S. at 447-48. They also do not dispute that they would condition vacatur on private providers achieving an 85% score on a 200-item survey that appears nowhere in the decree or federal law. AT Br. 51-52; *see also Olmstead*, 527 U.S. at 603 n.14 (disclaiming setting "standard of care" or requiring "certain level of benefits to individuals with disabilities"). And they do not dispute that decrees of this kind constrain successor

officials "in their ability to fulfill their duties as democratically-elected officials." *Horne*, 557 U.S. at 449-50.

Plaintiffs' sole response is that these costs are outweighed by "the ongoing violations of Plaintiffs' rights." AE Br. 48. But the balancing they invoke assumes systemic violations where there are none. *Supra* pp. 20-24. And *Ind. Prot. & Advocacy Servs. Comm'n v. Ind. Family & Soc. Servs. Admin.*, 149 F.4th 917, 943 (7th Cir. 2025), *see* AE Br. 48, is irrelevant. It did not involve a systemwide consent decree and was an example of equitable balancing in the preliminary injunction context where the record did not show that the plaintiffs' relief would cost the State any money. 149 F.4th at 935, 938. Here, plaintiffs seek open-ended budget increases until every eligible person finds a willing private provider that meets the 200-item quality survey and contend that a $1 billion annual increase is not "remotely sufficient." Doc. 853 at 19.

Meanwhile, the federalism costs continue to grow, as the proceedings creep outside their original scope. After the State filed its opening brief, the district court ordered the State to undertake "hundreds of hours of additional work," *see* Doc. 975 at 1, to produce documentation concerning several hundred individuals who reside in State Facilities, but for various reasons (*e.g.*, their or their guardian's choice) are not properly identified as Class Members, including what information was provided to them and, where the individual and their guardian disagreed over community placement, information about the disagreement. Docs. 974, 979. As explained, AT Br. 11-12, 23-24, 46, and as plaintiffs do not dispute on appeal, such individuals lie

outside the scope of the decree. The State explained that point below, but the district court dismissed it as irrelevant. *See* 7/16/26 Hr'g Tr. at 22-23 ("You know, and stop saying, oh, well, Judge, that's not within the corners of the *Ligas* consent [decree]. That's not it.").[5]

Courts should not let institutional reform consent decrees become "static and permanent," *Shakman v. Clerk of Cook Cty.*, 994 F.3d 832, 843 (7th Cir. 2021), and instead should ensure that "responsibility for discharging the State's obligations is returned promptly to the State and its officials," *Frew v. Hawkins*, 540 U.S. 431, 442 (2004). The time has come for the district court to return control of these important programs to the State.

---

[5] The transcript has not yet been docketed, but a true and correct copy is attached as an appendix to this brief.

## CONCLUSION

The court should reverse the district court's order denying the State's motion to vacate the 2011 consent decree.

Respectfully submitted,

**KWAME RAOUL**
Attorney General
State of Illinois

**JANE ELINOR NOTZ**
Solicitor General

115 South LaSalle Street
Chicago, Illinois 60603
(312) 814-3000

Attorneys for Defendants-Appellants

/s/ Jonathon M. Studer
**JONATHON M. STUDER**
Assistant Attorney General
115 South LaSalle Street
Chicago, Illinois 60603
(312) 814-0937 (office)
(312) 415-8065 (cell)
Jonathon.Studer@ilag.gov

August 28, 2026

**CERTIFICATE OF COMPLIANCE WITH WORD LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS**

I hereby certify that this brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and Circuit Rule 32 and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in proportionally spaced typeface using Microsoft® Word for Microsoft 365, in 12-point Century Schoolbook BT font, and complies with the type-volume limitations of Circuit Rule 32(c) because it contains 6,993 words.

/s/ Jonathon M. Studer
JONATHON M. STUDER
Assistant Attorney General
115 South LaSalle Street
Chicago, Illinois 60603
(312) 814-0937 (office)
(312) 415-8065 (cell)
Jonathon.Studer@ilag.gov

## CERTIFICATE OF FILING AND SERVICE

I certify that on August 28, 2026, I electronically filed the foregoing Reply Brief of Defendants-Appellants with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system.

All participants in this case are registered CM/ECF users and service will be accomplished by the CM/ECF system.

/s/ Jonathon M. Studer
JONATHON M. STUDER
Assistant Attorney General
115 South LaSalle Street
Chicago, Illinois 60603
(312) 814-0937 (office)
(312) 415-8065 (cell)
Jonathon.Studer@ilag.gov

# Appendix

July 16, 2026 Hr'g Tr.

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| STANLEY LIGAS, et al., | ) | No. 05 C 4331 |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| ELIZABETH WHITEHORN, et al., | ) | Chicago, Illinois |
| | ) | July 16, 2026 |
| Defendants. | ) | 10:01 a.m. |

TRANSCRIPT OF PROCEEDINGS - MOTION HEARING
BEFORE THE HONORABLE SHARON JOHNSON COLEMAN

APPEARANCES:

For the Plaintiffs: EQUIP FOR EQUALITY
BY: MS. SUJATHA JAGADEESH BRANCH
20 N. Michigan Avenue, Suite 300
Chicago, Illinois 60602

ROGER BALDWIN FOUNDATION OF ACLU, INC.
BY: MS. JENNIFER L. STARK
150 N. Michigan Avenue, Suite 600
Chicago, Illinois 60601

For the Defendants: OFFICE OF ATTORNEY GENERAL-ADMINISTRATION
BY: MS. ABIGAIL R. DURKIN
MS. DEBORAH M. BELTRAN
115 S. LaSalle Street
Chicago, Illinois 60603

Also Present: Ms. Lorene Reagan, Ligas Court Monitor

Court Reporter: TRACEY D. McCULLOUGH, CSR, RPR
Official Court Reporter
219 S. Dearborn Street, Room 1232
Chicago, Illinois 60604
312.435.5570
tracey_mccullough@ilnd.uscourts.gov

* * * * *

PROCEEDINGS REPORTED BY STENOTYPE
TRANSCRIPT PRODUCED USING COMPUTER-AIDED TRANSCRIPTION

(Proceedings heard in open court:)

THE CLERK: 05 C 4331, Ligas versus Whitehorn.

THE COURT: Plaintiffs, go ahead. Identify yourself.

MS. BRANCH: Good morning, Your Honor. I'm Sujatha Jagadeesh Branch, Equip for Equality, counsel for the plaintiff class.

THE COURT: Thank you.

MS. STARK: Good morning, Your Honor. I'm Jennifer Stark from the ACLU here for the plaintiffs' class.

THE COURT: Thank you.

MS. DURKIN: Good morning, Your Honor. Abigail Durkin here for the defendants.

MS. BELTRAN: Deborah Beltran also for the defendants.

THE COURT: All right.

COURT MONITOR REAGAN: Good morning, Your Honor. Lorene Reagan, Court Monitor.

THE COURT: Thank you, Miss Reagan, for being here.

All right. So, defendants, what do you want me to reconsider, and how much time do you want for this?

MS. DURKIN: Sure. Judge, we believe you should reconsider the order which relied on the Court Monitor's report in granting relief. We would like you to consider because we think the relief provided not only runs afoul of the consent decree, is not consistent with the plain language, does not impact substantial compliance, and additionally, included

misinformation provided to the Court. So we would like the Court to reconsider that. In the alternative --

THE COURT: Wait. Wait. Wait. Wait. Go to the misinfor --

MS. DURKIN: Sure.

THE COURT: Misinformation from who?

MS. DURKIN: The Court Monitor, Your Honor.

THE COURT: All right. What is that misinformation?

MS. DURKIN: Sure. So the Court Monitor suggested to Your Honor, stated to Your Honor that the defendants failed to provide court orders requiring placement to SODCs. We have provided that information in full to the Court Monitor. That said, there are requests that we did not come to an agreement on.

THE COURT: Hold on one second. Can you all move away from the podium and let my Court Monitor stand at the mic. Go ahead.

MS. DURKIN: Sure. So the specific misinformation that we're referring to is I believe on page 5 of the Court Monitor's report, the Court Monitor stated, "Defendants have not as of the date of this report provided the Court Monitor or plaintiffs with copies of the court orders mandating placements of Ligas Class Members in an SODC as ordered by the Court." We did provide that information.

THE COURT: All right. Your position.

COURT MONITOR REAGAN: So thank you. What defendants provided was information for 19 of the close to 300 Ligas class members that they reported living in state operated developmental centers as of December 2025. So my reference here is defendants have been referring to guardianship orders and court orders as court orders, right. So we have sort of had sort of a melding of terms I think that's made things a little bit unclear. All right.

MS. DURKIN: Your Honor, respectfully, we, we disagree. We have provided the Court Monitor with all 41 court orders requiring placement into an SODC. We provided the first round of that on May 26th consistent with Your Honor's order. And thereafter after my clients were able to gather the additional information, I think there were -- I believe there were six or seven outstanding. I believe on June 11th we provided all of them to the Court Monitor. We repeated this multiple times to the Court Monitor.

THE COURT: Wait. Wait. When you say you repeated it, you repeated what? You gave her more, or you repeated telling her this?

MS. DURKIN: We -- on May 26th we provided to the Court Monitor access to a link to download those court orders.

THE COURT: All right.

MS. DURKIN: We also provided it to plaintiffs. We did receive on my end confirmation that that information had

been downloaded. I can't tell by whom, but by someone who had the link. Thereafter we obtained the rest of the court orders that we noted to her remained outstanding, court orders requiring placement. We thereafter provided those to the Court Monitor. Now, I --

THE COURT: And when was that?

MS. DURKIN: I can find the exact date for you. I believe June 11th. June 11th.

THE COURT: All right.

MS. DURKIN: And throughout our various communications, we -- the Court Monitor did acknowledge that there had been some discrepancy in the language used. We were clear that the information we had provided to her was placement orders. And we have provided all of that information to her, which is not consistent with what she informed Your Honor.

THE COURT: Well, it sounds like there was a -- if there, if there is an inconsistency, it might be in terms. But you're saying that you provided these documents to her. Let's move on. Tell me what else is it about my order that you want me to reconsider.

MS. DURKIN: Sure. We believe that our actions taken in providing that updated SODC list was completely consistent with Your Honor's April order, which required specifically an updated SODC list. In crafting that, my clients engaged in a substantial undertaking to review individual by individual why

they were properly removed as class members from that list, and providing Your Honor --

THE COURT: Well, that was you all deciding what was important. It wasn't the list as a whole, correct? You all are sampling what you think is important.

MS. DURKIN: No. No. No, Your Honor. So when in crafting that list of 19 individuals, that list of individuals who are class members, properly identified as class members in an SODC, my client went through every single individual on that December 2025 list individual by individual, identifying do they actually meet the definition of Ligas class member or do they not. Because part of the complicating issue is that the class list maintained by DUIT doesn't up -- doesn't update. It doesn't remove someone from that list. If a person was ever identified as a class member --

THE COURT: I see what you're saying.

MS. DURKIN: -- they were forever.

THE COURT: Okay.

MS. DURKIN: So we were essentially overreporting. So to get to the heart of the question, which was how many Ligas class members are in SODCs, my client went through that entire list that we produced in December.

THE COURT: Okay.

MS. DURKIN: That included 286 individuals, and person by person made a determination does this individual actually

meet the definition of Ligas class member as of today to provide Your Honor with an updated list. Thereafter --

THE COURT: So stop a second.

MS. DURKIN: Sure.

THE COURT: So let me know this: If the Court were to say -- you said you went through the 200 people on the list to make a determination, correct?

MS. DURKIN: I'm sorry, Your Honor?

THE COURT: You say you went through the 200 people on the list. You just stated that.

MS. DURKIN: Yes.

THE COURT: Okay. Yes.

MS. DURKIN: 286 individuals were reported in December.

THE COURT: You did that. You all went through all of those, is that correct?

MS. DURKIN: All of them.

THE COURT: All right. Have you ever turned that list over to the Monitor?

MS. DURKIN: So the Monitor has the list from December. The issue is the underlying data that formed the basis of my client's determinations as to whether that individual is properly a class member.

THE COURT: Right.

MS. DURKIN: Now, the first position we have is the

Court Monitor is not entitled to information concerning individuals who are not Ligas class members. But that said, we know the -- we know that plaintiffs and the Court Monitor would have questions.

THE COURT: First of all, if -- she's the Court Monitor.

MS. DURKIN: Right.

THE COURT: So if this Court wants that information, yes, it can go to the Court Monitor. You all don't decide, oh, she's the Court Monitor, she doesn't get it. That's, that's not how court monitors works.

MS. DURKIN: We respect the honors of your Court, Your Honor. Our concern is that this information concerns individuals who are not Ligas class members, and we are bound by the plain language of the consent decree which concerns Ligas class members. Under paragraph 8, it is defendants' obligation to maintain the class list, and consistent with Your Honor's order we provided an updated list of class members properly identified as such in SODCs.

Because it was such a discrepancy between what we had previously been reporting, the 286 and the 19, that's a big difference. And we --

THE COURT: It sure is.

MS. DURKIN: Totally. We knew that the Court Monitor and plaintiffs would have questions. That said, those

individuals are not class members. And under paragraph 8, we believe what we did was completely consistent with the consent decree. But as a showing of good faith to demonstrate that what we relied on was -- that, that our decision making was correct, we agreed to provide a sampling of 25 percent of all of the different categories for the reasons people were --

THE COURT: Okay. So that's where I'm stopping you.

MS. DURKIN: Sure.

THE COURT: So I like the idea of good faith, and you all working together. When you say you have to get all these different documents and different numbers and 286 versus 19 together, how much effort does that? You all are making it sound like this is -- you all are back in the ages when I came into the system where, where you're using paperwork, and you're all going through it in a room and you're all putting together paper packets. That's not what happens here. You get that list by pressing a button on a computer. This is not something that is like mega effort that will take 45 days or longer to get this done. Am I correct?

MS. DURKIN: Your Honor --

THE COURT: I mean, you keep lists. And your lists that your person got to go through, obviously that was a lot of names and a lot of information, I get that, and I respect that, and I appreciate that. But when it comes time giving the Monitor a list of all the names and numbers, she can get this

without you all going through a 45-day or longer than that period, having multiple people involved going through this. All she wants is the information. Am I correct, Monitor?

COURT MONITOR REAGAN: You're correct.

MS. DURKIN: Your Honor, but, but two things. You reference a list, and then there's an issue of the list, which the Court Monitor has. There's also the, the underlying issue of the data that formed the basis for that decision making with that list. That is where, and I think my clients would readily admit this, we all wish the systems were differently and that those systems talked to each other. Unfortunately it is -- I don't know if it's pieces of paper literally in front of them, but it is a manual review. There is not like an export, you get a summary. They have to look at each individual's file for much of this information. And a lot of this information is included in things like case notes or individual plans. There's not a centralized database where they obtain this information.

So with respect to the lists, the Court Monitor has that list. But the underlying issue is what data form the basis of our decision making. That is the burden.

THE COURT: All right. Stop. Miss Reagan.

COURT MONITOR REAGAN: So, thank you. So what I would like to point out first is that defendants have a responsibility under, and I think it's paragraph 8 you just

mentioned, to maintain a list of class members. That list is to be expeditiously updated when there are changes in the list, in the list. And that updates -- in addition, updates should happen at least annually. This is from the plain language of the decree.

How it is that we could have gone from 2023 to 2026 with pretty much the same number of Ligas class members without a lot of changes to '19 is very concerning to me. It's also concerning to me that in year 15 of this decree that defendants do not have a centralized list and database. Okay.

What I would also say is that I think defendants do not understand -- and it's been clear, I think this has been pretty well documented over years, they do not understand basic concepts of data integrity. Okay. So when a list is produced, when a data production is given, it's understood that it's valid. It's been validated, right. So there's a cycle, right. It's data collection, data validation, data analysis, and data reporting. And you never get to the place of reporting in that cycle if you're producing a valid data sample of reporting until you're able to really show that you have looked at the underlying information, and you've provided that, if it's requested, and that you can reproduce that sample. Okay.

What defendants have asked, and it's not in keeping with any standards that I'm aware of for data collection, validation, analysis, and reporting where they've said -- they

actually said we did not look at the guardianship orders or provided documentation for the state's own conflict resolution policy, which exists within its SODC transition policy, that says if there's a difference of opinion between whether the person wants to stay in the institution or their guardian wants them to stay there, that there's a process to be followed.

That's the documentation that I believe is missing. And I do not believe it's appropriate for me to accept a data sample that I think is unstable, has not been validated under any circumstances, but especially since defendants have such difficulty producing valid and reliable data. And without it, we can't build measures for the implementation plan. We can't do a measurement of, of defendants' compliance with the decree. I'm really left wondering what are we doing here? Right.

So I understand the challenges faced by defendants, but I don't understand how we can be 15 years into this and not have systems in place for tracking basic elements of the decree.

THE COURT: All right. I appreciate your statements. I'm particularly concerned, and I've expressed this to the Monitor outside of your presence, and I'll express it here, too, is there is a real question on the issue of how this placement -- how these placements are there in the first place. Is this a request -- who's it from, the guardian, or is it from the patient themselves? Who is making the request that they

are where they are in these SODCs, right.

So that is a real question that needs to be answered before we can go forward. And if that is not clear -- if you all are taking samples from even just the ones that you have and saying, well, we're deciding that, well, this is this, this, this, no, she needs all you those for that. And you're saying it's what, 268, right?

MS. DURKIN: 286 individuals --

THE COURT: 86.

MS. DURKIN: -- were included on the December list, Your Honor.

THE COURT: Right. And so I guess the other question is, I'm also thinking and hearing this, is that obviously they're new. They're taking over here. Even they're new on the other side. They haven't been here forever. We've got a lot of new players, including the Monitor here. And it is disturbing to this Court. It's scary to think that I'm the one that's been around this thing longer than everybody in this room right now. That's scary.

And, you know, but the fact that certain steps have not been taken to update the way to keep these records is disturbing, but that part is not part of the decree. That's not something that they have to abide by. But it does make more sense for us to move forward to do something different, especially since technology has changed just a little bit. And

I know you're the state. I know, I know you all do not update things really quickly. We don't do great on the federal end, but you all are even worse. I know, and I say that as a former state employee. I understand.

So I don't want to get into a fight about that. What we need to do is be able to get this information, and sooner than later, and I don't think it's going to take the kind of time you all are saying it's going to take. I really don't. And so we've got to figure out a way to adjust that so she can get this information, because we cannot make some progress on who is really in these facilities or who should not be in these facilities if we don't know even really how they got there or why they're still there.

We need to know who's having the influence on these situations. And I'm not sure we have -- we don't have that information. Is that correct, Monitor? That's one of the problems. We don't know who has influenced them to be in the place they are, is that correct?

COURT MONITOR REAGAN: That's correct, yes.

THE COURT: All right.

MS. DURKIN: Your Honor, may I --

THE COURT: Yes.

MS. DURKIN: -- say one point.

THE COURT: Yes.

MS. DURKIN: Ligas is a case not about SODCs. It is

not about the closure of SODCs, the reduction in population of SODCs. We may all have that as a goal, but that is the -- that is not part of this consent decree. Our concern is that producing this information allows or suggests that the state or the Court Monitor is second guessing the choices of individuals and their guardians. That is not the state's role. It is not the Court Monitor's role.

THE COURT: How is that second guessing? All she -- all we want is the information as to who made the decision. That doesn't second guess it. Once we find out who made the decision, then it's up to the Court to decide what even -- maybe with some of her recommendations, but I'll be the ultimate determiner of what we are talking about here as to what situations that we have or what the state needs to do.

If it looks like there's -- the majority of them are all either court ordered guardianships, court ordered situations, that's one thing. That's different from it being a situation where we -- and especially with all the people I know are adults, you know, who are involved here. People who have aged through this whole thing. They may have started out as people who were very much on the young side, and now they've been -- they're adults. We have some people who are middle aged. People who have been around for a long time. And it's like, well, maybe, you know, they want -- have some autonomy. Maybe they want to make a statement about where they are. Or,

you know, maybe it's somebody else who continues to do it.

There is -- there are going to be factors there I think we can look at to determine what is best for this particular person, what argument can be made, or even set up a, a protocol or some type of formula for even the state to have a better handle on what they should be doing or not doing.

But again, the ultimate thing we have here, which has always been the issue, is that we have people who are in need and cannot necessarily speak for themselves. And some of them they still have the parents who are still speaking for them. So I get it. The parents who have been speaking, they want them here. This is their baby no matter how old their baby is, no matter what's been going on for decades, this is what they want, and they think it's better. And that might not always be the case.

The Monitor is not here -- she's not siding with one side or the other. She's not really trying to do that. She's trying to keep us all focused, at least that was why I picked her, keep us all focused on -- the ultimate thing is are we making the best use of this case and what's happening in this case.

MS. DURKIN: Yes.

THE COURT: And I don't want it to go on any longer than you all do. I really don't. But, on the other hand, I'm not going to cut it loose too soon and not have us all have the

right information.

MS. DURKIN: We understand that, Your Honor. So I -- a few points, though. I think it's important for everyone to recognize that regardless of whether -- for every individual in an SODC, regardless of whether they are properly identified as a Ligas class member or not, affords them no benefit. So by requiring defendants to undertake this deep dive of pulling additional data regarding the underlying choice of the guardian that we have -- we did look to the SODCs for that, employing the additional paperwork that was in Your Honor's order, that gives these individuals no benefit. And from our position it serves just to second guess the decision making of the state.

Whether or not an individual is a Ligas class member in an SODC, if they raise their hand to transition to the community, that title affords them no benefit. They are all -- they all have the same rights and -- with respect to timing and transition. So that is another thing I asked Your Honor to consider. That we understand the need for showing our work and, you know, shoring up our decision making to an extent. However, I think it's important to recognize what we're doing here provides them no benefit, and it just takes away from the work of reform that my clients do every day.

THE COURT: All right. Thank you. Anything else you want to say, and then I'll let the plaintiffs weigh in?

COURT MONITOR REAGAN: Sure. I guess what I'd like to

say, there's a couple of things, two things. I'll be brief. Over the past six months I've been visiting Ligas class members, institutionalized Ligas class members. I'll be providing another six-month update within the next month for the first half of this year. That included meeting Ligas class members in state operated developmental centers and also in intermediate care facilities.

I specifically audited the records of 30 people, and either interviewed them or attempted to interview them to better understand their perspectives on their placements. A number of people could not speak with me. And this is an issue I've brought up before, because they are not afforded communication systems or devices. They're unable to communicate verbally, so they're left with no way to really help me to understand their perspective.

But for those that could speak for themselves, there was only one person out of the 30 class members that specifically said I want to stay here unless I can live in this specific situation. So that's No. 1.

The other thing is that --

THE COURT: Wait. Wait. Wait. Go back. So they're saying they want to stay in the location they are.

COURT MONITOR REAGAN: Only one.

THE COURT: Only one. But that's what they're saying unless -- the only way they want to stay there is because if

they can't go to the place they want to go, they want to stay where they are?

COURT MONITOR REAGAN: Exactly right. So then in addition to those 30, I obviously met with -- I met with as many class members as I could. I couldn't audit all of their records. But there really was not a groundswell of I'd really love to stay here. Okay. I can assure you of that.

The other thing that I would argue is that, you know, defendants want to make this point that don't worry about it. Ligas class membership doesn't offer them any additional protections. It does offer them the opportunity to really make transparent the situations that they're living in and also the length of time they need to wait to transition. By defendants' own data until -- up and until December 2025, it was -- it took an average of 3.8 years for a person to be able to get back out of a state operated developmental center once admitted.

I think we would all agree that that's a long time, particularly when the person has indicated I'd like to live in the community. But the state didn't have community based services for them, which is the primary issue that we have here that needs to be solved. So as a result, they went in the institution. They're going to wait close to four years.

THE COURT: Thank you. Do you have anything to add here, plaintiffs, very briefly?

MS. BRANCH: Thank you, Your Honor. Very briefly. We

share the Court Monitor's concerns and totally disagree with the defendants about the value to class members of being class members when they're in SODCs. So they have a right to expeditious placement and services, and they have a range of rights in this case, including the oversight by the Court -- by the Court appointed counsel.

THE COURT: Well, how, how -- if this case goes on even for this purpose, how at the out -- at the finish line, how are the Ligas class members that you represent, how are they benefiting? I mean, after a certain point, you know, we're collecting data. What they do get -- what benefit are they getting? And that's what I don't want to keep going on, because we're basically making ourselves feel good because we've got this case going on for how many -- and we actually -- it doesn't make me feel good. This case is an '05 case. I didn't even come on the bench until 2010.

MS. BRANCH: Your Honor, I'm eager to move beyond data to --

THE COURT: Because that's what we're doing. We're basically like shuffling around a case. And we make it -- oh, I'm on Ligas. I feel good. I'm on Ligas. I'm a Ligas litigant. I'm an advocate for them. But if we're not making -- doing anything other than coming back and forth to court and making arguments and having speeches, what is it doing? I know it's not doing anything for me, and I don't feel

like I'm doing justice.

So I just want to know -- you all need to understand, we are coming to the point. All right. And again, right now I'm still here. I have gone past my date that I should be leaving. I have gone past it. So I'm going to tell you, I'm not having some other judge have to come in and take this over. I'm not doing that. So it's going to end one way or the other. Just be warned. And I'm saying it on the record, and that's the way I feel.

So you've got to figure out a way, everybody, if you really are trying to do justice here, you have empathy for the people who are involved here, trying to make something work that's going to be rational but practical, and get something done for people who cannot help themselves. Not for their parents, not for their relatives, not for our good wishes, but for those people, then that's what we need to work on. And you all are the ones who should work that out.

You have a monitor who could have been, you know, supervising this. She's got lots of experience. She hadn't been here -- she wasn't the one who was here -- who had been here and everybody just move her around and she'd go from here to here, and everybody was happy. No. We've got somebody else who came from outside and said, wait a minute. What's going on here? And so she goes around and talks to people individually. She's got the energy to do that. That's what she did.

And so I am listening to her, and, you know, but this all, oh, oh, objection, Judge. Objection. We want a hearing. We want a hearing. We want to have you reconsider what you did, no. You all need to do the work and get this done. Move it forward. You've got teams of people on each side. People running up with papers and stuff. Let's get this done. I'm getting very frustrated. You know, very frustrated. This is not justice. This is not me providing any results. It really is not.

And so, you know, one side agrees with the Monitor this time. Then after a while it's going to be the other side that's going to be agreeing with the Monitor, and then the Monitor is in the middle and trying to answer to me. And she's saying, hey, I'm trying to do what you want, Judge, but I don't know what is wanted anymore.

So I have all of this on record. I'm going to take in consideration what you've been asking for, what your concerns are, and I will issue another order. And in the meantime, I expect there to be some effort made, and you can actually go out in the hall today if you need to. You know, talk or make an appointment soon before the summer gets long, where you all can talk about how you go forward. Because this is, this is getting a bit ridiculous that we are spinning. We've got to stop it. You know, and stop saying, oh, well, Judge, that's not within the corners of the Ligas consent. That's not it.

Or, on the other hand, don't forget all these Ligas plaintiffs. Don't forget them all. You know, next time I'll have something, you all will have a crowd of people here in their various contraptions or various issues with their nurses. Everybody will be lining up, and I'll have all the press here. And that's what we're doing. We're doing show and tell. That's not helpful to people. I don't want to drag people in here who can't -- who shouldn't even be here.

And then we're all ashamed because, oh, well, we're just still standing here acting like lawyers, and we've got people who really need to be places. And I -- you know, we've made great movement since this started. We've gotten more, more assistance. We've gotten more money toward this whole situation. We've had more activity. I know you're keeping records. They aren't kept as well as they can be. They've got to be -- you've got to do better. You've got great technology. Make it work. That's where I am on this.

So I hear you have a motion to reconsider. I will look at it based on some of the things you've said, some of the things the Monitor has said, and then I will issue another order. And then I expect it to be complied with. I'll have a timeline on it. All right. We're going to try to get this part done. I'm not doing this 45 days plus thing. We're going to get some things done before the end of the summer.

MS. DURKIN: Sure, Your Honor. And, and we appreciate

that. Just one clarification for my client because my client is going to say what about the Court's order about the deadline. We would ask that the Court stay that deadline, but in the meantime --

THE COURT: What's my current deadline?

MS. DURKIN: 14 days. So I believe that's the 20th.

THE COURT: The 20th of this month?

MS. DURKIN: Yes.

THE COURT: Yes, so that's vacated. I'll issue a new deadline.

MS. DURKIN: Thank you. That said, we have agreed, and my client is currently working to provide some of -- to gather and produce some of that information, and we can talk with plaintiffs and the Court Monitor about an appropriate date for that not far from today.

THE COURT: All right. I appreciate that. Plaintiff, you have anything else to add?

MS. BRANCH: Thank you, Your Honor. We're also very eager to move forward and make sure our clients get the services they need.

THE COURT: We'll all do the best we can. Anything else from Miss Reagan?

COURT MONITOR REAGAN: No. Thank you, Your Honor.

THE COURT: All right. You know how to get in touch with me. All right. All right. Thank you all.

MS. DURKIN: Thank you, Your Honor.

THE COURT: Take care.

(Concluded at 10:30 a.m.)

* * * * *

I certify that the foregoing is a correct transcript of the record of proceedings in the above-entitled matter.

/s/ TRACEY D. McCULLOUGH July 17, 2026
TRACEY D. McCULLOUGH, CSR, RPR
Official Court Reporter